**S.S., Plaintiff,**

v.

**EASTERN KENTUCKY UNIVERSITY, et al., Defendants.**

**No. CIV.A. 5:03–20–JMH.**

United States District Court,
E.D. Kentucky,
Lexington.

May 19, 2006.

---

Christopher S. Turner, Yunker & Associates, J. Dale Golden, Golden & Walters PLLC, Katherine S. Sanford, Yunker & Associates, Katherine K. Yunker, Yunker & Associates, Oran S. McFarlan, III, Yunker & Associates, Lexington, KY, for S.S. a minor, by and through his Parents and Next of Friends Next Friend James Stutts Next Friend Carol Stutts, Plaintiff.

Douglas L. McSwain, Sturgill, Turner, Barker & Moloney PLLC, Joshua Michael Salsburey, Sturgill, Turner, Barker & Moloney PLLC, Merrie Kristin Winfrey, Sturgill, Turner, Barker & Moloney PLLC, Patricia T. Bausch, Sturgill, Turner, Barker & Moloney PLLC, Stephen Lewis Barker, Sturgill, Turner, Barker & Moloney PLLC, Lexington, KY, for Eastern Kentucky University, Jacqueline Vance Individually, Ellen Rini Individually, Defendants.

## MEMORANDUM OPINION AND ORDER

HOOD, District Judge.

This matter is before the Court on Defendants' motion for summary judgment [Record No. 189].[1] All responses and replies having been filed, this matter is now ripe for review.

## I. FACTUAL BACKGROUND

### A. Introduction

At the time this case was filed, Plaintiff was a student enrolled at the Model Laboratory Middle School ("Model"), which is operated by Defendant Eastern Kentucky University ("EKU") to train student teachers under the supervision of certified teachers. Plaintiff has since enrolled at another school. Plaintiff has been diagnosed with cerebral palsy; attention deficit/hyperactivity disorder, dyslexia, pervasive developmental disorder, and post traumatic stress disorder. As a result of his physical and mental disabilities, his education was directed by an Individual Education Plan ("IEP") developed by the Admissions and Release Committee ("ARC") at Model. Defendant Vance serves as the Director of Model, and Defendant Rini is Model's school psychologist.

This action arises out of a long and unfortunate string of incidents that occurred during Plaintiff's time at Model. While the particulars of Plaintiff's legal claims will be discussed in Section IV, *infra*, the core of all of Plaintiff's allega-

---

1. Also pending is Plaintiff's motion for summary disposition of certain affirmative defenses [Record No. 183]. As Plaintiff's motion does not seek summary judgment on his own claims, but rather only a ruling that Defendants cannot present certain defenses at trial, there is no need to consider Plaintiff's motion at this time.

tions is the failure of Model and its administrators, particularly Vance and Rini, to adequately respond to those incidents and maintain a safe educational environment for Plaintiff. The parties tell markedly different versions of many events, but as also discussed in Section IV, *infra*, for the most part those differences are not material. Therefore, the incidents and responses need only be described in sufficient detail to provide context for the discussion that follows.

## B. Incidents in Sixth Grade

Plaintiff entered Model as a sixth-grader in 2000. In August of 2000, students threw wet paper towels at Plaintiff in the school's locker room. Plaintiff claims that the paper towels were soaked with urine and that the students who threw the paper towels also taunted him by calling him a "mental retard," "gay," and "queer." First Plaintiff, and a few days later his parents, informed Rini of the incident. Model conducted an investigation, and two students admitted throwing paper towels soaked with water at Plaintiff. The two students were told to stop and their parents were notified.

Also in August of 2000, Plaintiff claimed that someone had written "[Plaintiff] is gay" on a blackboard in the school library, and that someone had slammed his head into the blackboard. The school investigated, and a witness stated that Plaintiff had written the message on the board himself and then accidentally rammed his own head into the board. Gene Wolf, Plaintiff's special education teacher, saw the board and indicated that he believed that the handwriting was Plaintiff's. Nevertheless, the school responded by individually counseling students in Plaintiff's grade about name-calling, and telling them to stop whatever name-calling they may have been doing. During the process, several students told the administrators that there were frequent problems with Plaintiff instigating name-calling.

There were two incidents in January 2001. On January 22, Plaintiff alleges that he was verbally harassed and physically assaulted in the lunchroom and a hallway. According to Plaintiff, Model teachers responded at the scene, but Defendants state that they never received any complaint or report of any incident on or around that date. On January 26, Plaintiff alleges that a student hit him in the head and slammed his head into a heater. He states that he notified the school, but again, Defendants state that they never received a complaint or report of any incident.

In February of 2001, Plaintiff claimed that a student tackled him in the hall and rammed textbooks into his chest. Model investigated, the other student was sent home with a half-day suspension, and the school's Disciplinary Committee was convened. The Disciplinary Committee found neither student blameless and gave both warnings.

## C. Incidents in Seventh Grade

In September of 2001, Plaintiff had what the complaint refers to as the "cerebral events," and what Defendants refer to as Plaintiff violently attacking students, teachers, and administrators. Plaintiff claims that following the events he was punished by not being allowed to participate in lunch or recess for a period of several weeks. Defendants claim that it was not punishment, but rather that the ARC had a meeting, in which Plaintiff's parents participated, and that it was agreed for the sake of safety that Plaintiff would not join the rest of the class for lunch or recess, and that he would leave each class five minutes early.

In October of 2001, Plaintiff's mother reported to Vance that she had heard someone tell Plaintiff, "You are dead."

There is no evidence of a response by the school. Also in October, according to Plaintiff, a student kicked him in the presence of a teacher. Defendants state that they have no knowledge of the incident.

Sometime during the fall of 2001, Plaintiff told Rini that a student had sexually assaulted him in the locker room by grabbing Plaintiff's genitals and saying, "Now I'll see if you are a woman." The school investigated, but the other student denied the accusations, and the school could not determine who to believe. Plaintiff's parents asked that the locker room be monitored while students were changing, but instead, the school changed the other student's schedule and allowed Plaintiff to use a separate locker room to change for gym class.

In February of 2002, Model had a problem with three or four boys, including Plaintiff, engaging in flatulence during class. Plaintiff's mother informed Model that Plaintiff experienced involuntary flatulence as a side effect of one of his medications, and that he was being teased and harassed as a result. The school looked into the matter, and Plaintiff was moved to a seat near a window and told that he was free to leave class if he felt the need. The other students were told not to egg Plaintiff on.

Also in February of 2002, Plaintiff claimed that two students attacked him. A teacher witnessed the altercation and sent all three students to Vance's office. An investigation could not determine who started the violence. Vance attempted to resolve the matter through a mediation session between Plaintiff and one of the other students, but the session was terminated because Plaintiff began insulting and taunting one of the other students. As the other student left the room, Plaintiff tried to trip him.

In March of 2002, Plaintiff claims that his mother was informed that he would not be allowed to play on the school baseball team. An email to Plaintiff's mother indicated that the coach wanted Plaintiff to play, but wanted reassurance that it was safe, based on his slow reflexes and the potential danger of being hit with a ball. The school asked Plaintiff's parents to sign a waiver, which they apparently did, because Plaintiff was allowed to join the team.

On April 29, 2002, Plaintiff claimed that he was attacked in the cafeteria, and that the altercation culminated with his head being thrown through a glass sneeze-guard. Plaintiff's parents took him to an emergency room and filed a police report. Witnesses differed on the details of the incident, with some saying that Plaintiff instigated the conflict. All agreed that the other student had pushed Plaintiff into the glass, although some said that Plaintiff's arm, rather than his head, had gone through the glass. Plaintiff's father took him to the hospital, where he was treated for a sprained neck. Plaintiff and the other student each received a one-day suspension and were not allowed to go on a school trip to Washington, D.C. and Virginia. The other student also received Saturday detention. Plaintiff's father filed a police complaint; the other student went to trial and was acquitted.

On May 2, 2002, Plaintiff claimed that the same student involved in the prior incident had pulled Plaintiff's chair out from under him, causing him to fall and hit his head. A teacher who witnessed the incident stated that Plaintiff pushed the chair out himself and then falsely accused the other student.

On May 21, 2002, Plaintiff was in Vance's office as a result of some minor disciplinary issues and he was told to speak with an administrator. When he tried to use the phone to call his mother, the phone was taken away from him.

About ten minutes later, he was allowed to call his mother.

### D. Incidents in Eight Grade

On August 15, 2002, following a school picnic attended by Plaintiff and his mother, Plaintiff's mother reported to the school that he had been bullied, that a student had called him a "bastard," and that other students had not allowed him to sit at their table. A teacher who had been assigned to monitor Plaintiff during the picnic reported that he had not witnessed anything inappropriate. The following day, Rini emailed Plaintiff's mother, indicating that she did not believe that bullying was a problem for Plaintiff.

On August 20, 2002, according to Plaintiff, Rini told Plaintiff's parents that she refused to accept the diagnosis of post traumatic disorder. The basis was an email sent from Rini to Dr. Sutton, asking for clarification of some information provided to the school, which Rini felt was unclear. Rini denies that she was refusing to accept anything.

On August 28, 2002, a student hit Plaintiff in the back of the head with a drum stick during marching band practice. Vance inspected his head, found no marks or bleeding, gave Plaintiff a pain tablet, and called Plaintiff's mother.

In October of 2002, Plaintiff claimed that on two days in a row other students threw bleach on him during science class. An investigation revealed that the students accused by Plaintiff were not in the classroom at the time, and a student stated that Plaintiff had spilled the bleach on himself.

On October 28, 2002, Plaintiff reported to one of his teachers that other students were extorting money from him, by borrowing money and not paying it back. The teacher spoke with the other students, and the problem stopped.

Plaintiff alleges that on October 29, 2002, he was attacked by two students during science class while the teacher was out of the room. Plaintiff's mother met with Vance and told her that harassment and bullying were problems.

On October 31, 2002, Plaintiff claimed that two students mocked his speech patterns during recess. A teacher who witnessed the incident indicated that Plaintiff kicked the other student. The students were placed in different recess groups.

On November 7, 2002, Plaintiff alleges that he was mocked and attacked by "one of his frequent attackers." Teachers responded and separated the two, and Vance called the police. While the two students were waiting in separate parts of the office, Plaintiff got up and attacked the other student again. The school investigated but could not determine who was primarily at fault for the initial fight, and the police could not determine who was at fault either. Both students were suspended, Plaintiff for five days and the other student for three.

On November 18, 2002, Plaintiff alleges that he was attacked at recess and that he reported the incident to a teacher. Defendants state that they have no knowledge of the incident.

On that same date, a student reported that Plaintiff had threatened to kill another student. The school suspended Plaintiff again, despite his denial that he had made any such statement.

## II. PROCEDURAL BACKGROUND

Plaintiff's complaint alleges violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132; violations of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794; and constitutional violations brought pursuant to 42 U.S.C. § 1983. The complaint also alleges negligence and the tort of outrageous conduct. By prior orders the claims have

been narrowed to the following: Rehabilitation Act claims against EKU and against Vance and Rini in their official capacities; ADA claims against EKU and against Vance and Rini in their official capacities based on equal protection and substantive due process; § 1983 claims against Vance and Rini in their individual capacities based on equal protection; and the state tort claims against Vance and Rini in their individual capacities.

This Court previously granted summary judgment in favor of Defendants, finding that Plaintiff's failure to exhaust his administrative remedies under the IDEA barred his claims in this action. Plaintiff appealed, but during the pendency of his appeal the remedies were exhausted, and the case was remanded.[2]

## III. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The moving party bears the initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This burden is met by showing the court that there is an absence of evidence on a material fact on which the nonmoving party has the ultimate burden of proof at trial. *Id.* at 325, 106 S.Ct. 2548. A fact is material if its resolution will affect the outcome of the lawsuit. *Waters v. City of Morristown*, 242 F.3d 353, 358 (6th Cir.2001); *see Pharakhone v. Nissan N. Am., Inc.*, 324 F.3d

405, 407 (6th Cir.2003) ("If, under the governing law, the outcome would be the same regardless of how a factual dispute is resolved, the dispute is no bar to summary judgment."). Once the moving party satisfies its burden, the burden then shifts to the nonmoving party to "come forward with some probative evidence to support its claim." *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir.1994).

When determining whether there is enough evidence to overcome summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Multimedia 2000, Inc. v. Attard*, 374 F.3d 377, 380 (6th Cir.2004). The Court must not weigh the evidence, but must decide whether there are genuine issues for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. Only material factual disputes will preclude summary judgment, and the dispute must be genuine, that is, the facts must be such that if proven at trial, a reasonable jury could return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505.

## IV. DISCUSSION

### A. Plaintiff's Claims

As noted above, Plaintiff states claims under both Title II of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("Rehabilitation Act") against Model and against Vance and Rini in their official capacities. Plaintiff also states claims against Vance and Rini in their individual capacity under 42 U.S.C. § 1983, as well as under the Kentucky torts of outrage and negligence.

---

**2.** Defendants argue that they are entitled to summary judgment both on the merits of Plaintiff's claims, or in the alternative, because some or all of Plaintiff's claims are collaterally estopped by the administrative de-

terminations. Because the Court finds that summary judgment is warranted based on the merits of Plaintiff's claims, there is no need to reach the preclusion argument.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

■ While the Rehabilitation Act and ADA are not identical, the Sixth Circuit has held that "because the purpose, scope, and governing standards of the acts are largely the same, cases construing one statute are instructive in construing the other." *Doe v. Woodford Cty. Bd. of Educ.*, 213 F.3d 921, 925 (6th Cir.2000)(internal quotation marks omitted). The elements under both the Rehabilitation Act and the ADA are the same: (1) that Plaintiff is a person with a disability under the Act; (2) that Plaintiff is "otherwise qualified" for participation in the program; and (3) that Plaintiff is being excluded from participation in or being denied the benefits of a program, or being subjected to discrimination by reason of his disability.[3]

■ Plaintiff's § 1983 claims against Vance and Rini require him to show (1) that he has been deprived of a right guaranteed by the Constitution or federal law, and (2) that the deprivation was caused by a person acting under color of state law. *See McQueen v. Beecher Cmty. Schools,* 433 F.3d 460, 463 (6th Cir.2006). It is not contested that Vance and Rini acted under state law; therefore Plaintiff must only show that there is a genuine dispute of material fact as to whether he was deprived of a federal right.

■ Plaintiff's state law outrage claim requires that Vance and Rini intentionally or recklessly engaged in outrageous conduct that "offends against the generally accepted standards of decency and morality," and that their conduct caused severe emotional distress to Plaintiff. *See Osborne v. Payne,* 31 S.W.3d 911, 913–14 (Ky.2000). Plaintiff's negligence claim requires that he show the familiar elements of duty, breach, causation, and harm. The individual capacity claims further require the Court to consider the affirmative defense of qualified immunity, which will be discussed below.

### B. Issues Common to All Claims

■ Two issues common to all claims must first be addressed. First, as noted above, in many of the incidents there are factual disputes as to who said what, who hit whom, and how things started.[4] As a preliminary matter, therefore, the Court notes that none of these disputes relating to particular incidents are material to the ultimate issues in the case.[5] This action is about the response of Model and its administrators to reports of bullying and harassment, and they could only respond based on the information in their possession. Even if Plaintiff could prove, for any

**3.** Under the Rehabilitation Act, there is the additional element that the defendant be an entity receiving federal funds; that element is not contested.

**4.** For the incidents about which Defendants state they have no knowledge, the Court takes Plaintiff's version of events as true.

**5.** Plaintiff in his response makes no argument that they are material; nevertheless, in light of the number of incidents for which there is some dispute, the Court will address the materiality of these disputes.

particular incident, that he was telling the truth and the other witnesses were lying, that would not affect the outcome under any of Plaintiff's theories, and therefore the factual disputes between Plaintiff and other student and adult witnesses over who started which fight will not prevent summary judgment.[6]

Second, the Court must note that all of Plaintiff's claims suffer from the same basic deficiency, that despite Plaintiff's assertions that Model and its administrators harbored irrational biases against Plaintiff because of his disabilities, there is no evidence upon which a reasonable jury could base such a finding. A party cannot rest on his pleadings to avoid summary judgment, and the fact that Plaintiff alleges bias and discrimination, if unsupported by evidence, is not sufficient to create a genuine issue of fact. The record is clear that when incidents were reported, they were investigated, and responsive action was taken.

Plaintiff's response to the summary judgment motion illustrates well the problems underlying Plaintiff's own claims. According to Plaintiff, virtually everything Defendants did in response to incidents was discriminatory, including the actions Defendants took that were the opposite of other actions that Plaintiff also claims were discriminatory. On one page of the response, the failure of the school to monitor Plaintiff in the locker room is purported to be evidence of animus and discrimination; on another page, the decision to monitor Plaintiff in the hallways is also evidence of bias and discrimination. According to Plaintiff's mother, the "discriminatory" monitoring in the hallway stopped any harassment that was occurring, yet on several other pages it is asserted that the failure to protect Plaintiff from harassment is evidence of irrational bias and discrimination. On one page, the refusal to investigate an incident to Plaintiff's parents' satisfaction is evidence of bias and animus; on another, conducting a full investigation that involved interviewing students about their interactions with Plaintiff is also discrimination, because doing so called attention to Plaintiff.

Plaintiff even introduces, as evidence of discrimination, deposition testimony showing that it was perceived by other students that teachers and administrators treated Plaintiff *better* than other students, and that the school let Plaintiff get away with things for which other students would have been punished. This comes sandwiched between claims that Plaintiff was treated worse and was punished more harshly than other students because of Defendants' biases against him. At a later point, Plaintiff offers as "an example of disparate treatment" the fact that any other student besides Plaintiff who had been involved in three incidents involving calls to the campus police would have been "removed from Model"; this act of *not* expelling Plaintiff apparently was also somehow done to discriminate against him because of his disabilities.[7]

---

6. To illustrate the type of dispute that might be material, in comparison to the underlying factual disputes, the incident when "[Plaintiff] is gay" was written on the chalkboard can be taken as an example. If Plaintiff were challenging whether his special education teacher, Gene Wolf, had in fact told Vance that he believed the phrase was written in Plaintiff's own handwriting, that might be a material factual dispute (although to be a genuine dispute Plaintiff would still need to produce evi-

dence). However, if it is not challenged that the school's administrators were told that by Wolf, a source they had no reason to disbelieve, and Wolf was in fact wrong, Wolf's error does not affect how Defendants' actions should be judged.

7. One can only wonder whether a decision by Defendants to "remove [Plaintiff] from Model" would also have formed the basis of a discrimination claim.

Plaintiff gives no indication what the school should have done,[8] and there is no formal reason, perhaps, requiring Plaintiff at this point to identify a better approach to school safety and discipline. Nevertheless, Plaintiff's claims that Model and its administrators deviated from some normative ideal of what a school should do is undercut by the absence of any proposed standard; all the Court is left with are Plaintiff's self-contradictory and unsupported claims that everything Defendants did was done because of their biases and their desire to inflict harm on Plaintiff.

## C. The Discrimination Claims

Plaintiff's ADA, Rehabilitation Act, and § 1983 claims sound in part in equal protection, whether they require a showing of an actual constitutional violation or not.[9] As noted above, Plaintiff must show (1) that Plaintiff is a person with a disability under the Act; (2) that Plaintiff is otherwise qualified for participation in the program; and (3) that Plaintiff is being excluded from participation in or being denied the benefits of a program, or being subjected to discrimination by reason of his disability.

While Defendants have challenged whether Plaintiff is even a qualified individual with a disability, pointing out that

he was in some ways an active participant in school activities, Plaintiff has at least raised an issue of material fact on those issues. Therefore, at this point whether these claims can go forward comes down to whether Plaintiff was excluded from participation in or was denied the benefits of a program, or was subjected to discrimination by reason of his disability. For the reasons discussed below, the Court finds that there are no genuine issues of material fact remaining, and that Defendants are entitled to judgment as a matter of law on these claims.

### i. The Bad Faith Element

For both the Rehabilitation Act and ADA claims, Plaintiff must show that he was discriminated against, or that he was denied the benefits of or participation in programs. In considering the need for a plaintiff to prove discrimination under the Rehabilitation Act, the Sixth Circuit recently held that "[s]urmounting that evidentiary hurdle requires that either bad faith or gross misjudgment must be shown before a § 504 violation can be made out, at least in the context of education of handicapped children." *Campbell v. Bd. of Educ.*, 58 Fed.Appx. 162, 167 (6th Cir. 2003) (quoting *Monahan v. Nebraska*, 687 F.2d 1164, 1171 (8th Cir.1982)); *see also*

---

**8.** The one arguable exception in the record comes from the report and deposition of Plaintiff's expert, Vernon Wiehe, which is not even cited in Plaintiff's response to Defendants' motion. While legitimate questions have been raised about Wiehe's expertise, the Court can assume for purposes of this motion that he is correct in his opinion that an "ecological" approach to bullying would have helped. Even so, Wiehe's suggestions are so vague and distant from the actual issues in the case as to be irrelevant, which perhaps explains why Plaintiff chose not to cite Wiehe's report or deposition in responding to this motion.

**9.** By "sounding in equal protection," the Court is referring to both actual violations of

the Equal Protection Clause, as well as equal-protection-like claims that do not require a constitutional violation. The Court has previously determined that Plaintiff's ADA claims sounding in equal protection can only go forward to the extent that they state an actual violation of Plaintiff's rights under the Equal Protection Clause. Such a requirement does not apply to Plaintiff's Rehabilitation Act claims. The claims can be considered together without reaching the constitutional issues, however, because Plaintiff fails to show that the basic elements of discrimination, common to all of these claims, including the § 1983 claims, have been met.

*Child v. San Bernardino Unified Sch. Dist.*, 35 Fed.Appx. 521, 523 (9th Cir. 2002); *Sellers v. Sch. Bd.*, 141 F.3d 524, 529 (4th Cir.1998) (requiring bad faith or gross misjudgment). The bad faith or gross misjudgment standard has been applied not only to complaints relating to education itself, but also to the failure to protect a student from another student's harassment. *See Doe. v. Lennox. Sch. Dist.*, 329 F.Supp.2d 1063, 1069–70 (D.S.D. 2003).[10] While Plaintiff seems to regard the bad faith standard as an extra-statutory element relating only to claims raising constitutional issues, courts have uniformly applied it under both the ADA and Rehabilitation Act, finding its origin in the statutory language, which prohibits discrimination, not negligence. *See, e.g., Campbell*, 58 Fed.Appx. at 167; *Smith ex rel. Townsend v. Special Sch. Dist. No. 1*, 184 F.3d 764, 769 (8th Cir.1999)(noting that the ADA and Rehabilitation Act do not "create general tort liability for educational malpractice").

### ii. Specific Instances of Discrimination

While Plaintiff's charges are directed largely at the discriminatory nature of the failure of the school to create a safe environment for Plaintiff, Plaintiff also charges discrimination based on specific instances.[11] None of the examples of disparate treatment, however, even if accepted as true and taking all inferences in favor of Plaintiff, constitute discrimination.

To discriminate is to treat similarly situated people in different ways based on a protected characteristic. *See, e.g., Prater v. City of Burnside*, 289. F.3d 417, 429 (6th Cir.2002). The corollary is that if two people are not similarly situated, treating them differently is not discrimination. Defendants have produced evidence showing that Plaintiff was treated differently because the incidents were different, and Plaintiff has not presented anything to rebut that assertion. Even if they were similarly situated, moreover, there is no reason to believe that any disparate treatment was related to Plaintiff's disabilities.

Plaintiff claims that it was discriminatory for Plaintiff to receive a five-day suspension following the November 7, 2002 fight, when the other student involved only received a three-day suspension. Defendants claim, however, that the extra two days were because Plaintiff attacked the student again after they had been brought to the office. This is a perfectly reasonable explanation for why the students were not similarly situated, and in fact, even before the suspensions were handed out, Plaintiff's mother told Plaintiff that he might very well be suspended for hitting the other student in the office. Therefore, Plaintiff cannot show that the differing suspensions were discriminatory.

Plaintiff also claims that the "refusal to investigate" his charge of sexual assault in the locker room, but to take a non-disabled student's claims that she was be-

---

10. The parties dispute whether Plaintiff must also show "deliberate indifference" for all of his claims. Plaintiff concedes that he must show deliberate indifference to make out his constitutional claims, but argues that it plays no part in proving the statutory violations. Defendants disagree, citing authority from other circuits in support of the proposition that deliberate indifference is required. The Sixth Circuit has not ruled on the issue, and this Court need not decide; Plaintiff cannot meet the *prima facie* case for ADA and Rehabilitation Act claims because he cannot show discrimination, and even if he could, there is no evidence from which a reasonable jury could find that Defendants acted in bad faith.

11. These are the specific instances of discrimination cited by Plaintiff in response to Defendants' argument that there was no discrimination. The Court sees no other instances of different treatment in the record.

ing sexually harassed seriously enough to bring in a speaker about sexual harassment to talk to the class, was discriminatory. This claim fails for a number of reasons. First, Plaintiff's claim that there was a "refusal to investigate" is patently untrue. Second, in the case of Plaintiff's allegations of sexual assault, it was determined following an investigation that Plaintiff's claim was not credible, but the school responded anyway by changing the other student's schedule and giving Plaintiff a place to change separately.[12] In the case of the complaints of Plaintiff sexually harassing a girl, it is not evident that there ever any denial by Plaintiff that the conduct occurred, and moreover, the conduct was ongoing and the school had received complaints from six different girls about Plaintiff. The situations simply were not the same.

■ Plaintiff also claims it was discriminatory for Defendant to have taken seriously a report of a threat made by Plaintiff against another student, but to have disregarded a threat Plaintiff's mother heard another student make against Plaintiff. By Plaintiff's eight grade year, when he is alleged to have made the threat, Defendants were well-acquainted with his history and were perfectly entitled to take a threat made by him seriously. In contrast, there is no evidence establishing that the student making the threat Plaintiff's

mother heard constituted a serious threat to Plaintiff. Nor again, as with all of the other instances of alleged discrimination, is there any evidence that the decision to take Plaintiff's threat seriously had anything to do with biases relating to his disabilities.

■ Finally, Plaintiff claims that the failure to call police following the fight in the cafeteria, while calling the police following the fight in November of 2002, was discriminatory. There is no reason to think that calling the police in the second instance had anything to do with Plaintiff's disability; indeed, the police reports indicate that both students were being investigated.[13]

Plaintiff has not produced any evidence that he was discriminated against because of his disabilities in the individual instances cited above, or that, even if discrimination occurred, a reasonable jury could find that Defendants acted in bad faith or with gross misjudgment. Therefore, the discrimination claims based on these incidents cannot survive summary judgment.

### iii. The Hostile Environment/Failure to Protect Claim

■ The Court must also consider Plaintiff's claim that the failure of Model and its administrators to protect him from bullying constitutes discrimination by vir-

---

**12.** Plaintiff's real complaint relating to this incident seems to be the refusal of the school to monitor the locker room. In light of the fact that this incident was around the same time as Plaintiff's parents were complaining about the monitoring of Plaintiff in the hallway, and in light of the fact that the monitoring of Plaintiff in the hallway is now alleged to be discriminatory, it is hard to fault the school for deciding not to add a monitor in the locker room, but to separate the two students instead. Moreover, the Court finds no case law suggesting that it is discriminatory for a school to fail to respond to an incident in precisely the manner a parent wants.

**13.** Nor is there any reason to think that at some point the school could not simply have "had enough." When Plaintiff's father was asked at his deposition why he had called the police after one incident when he had not done so after previous incidents, he stated that at some point the problems had compounded to the point such that stronger measures, such as involving the police, were needed. There is no reason the school could not have reached the same conclusion at some point.

tue of the hostile learning environment that was created. Bad faith or gross misjudgment are elements of this claim as well, and just as with the specific incidents complained of, Plaintiff has produced no evidence upon which a jury could find that Defendants acted with that level of culpability in regard to any failure to protect Plaintiff. Plaintiff's claim that Defendants fostered a hostile learning environment for him *because of his disability* are completely unsupported by evidence. The ADA and Rehabilitation Act do not punish "educational malpractice," *see Smith,* 184 F.3d at 769, and Plaintiff has cited no cases in which a school has been held liable under any of the federal statutes because of peer-on-peer bullying. Therefore, Plaintiff's claims based on a hostile learning environment must be dismissed as well.

### D. The Substantive Due Process Claims

▮ The Court earlier allowed Plaintiff's ADA claims sounding in substantive due process to go forward based on the state-created danger theory, which the Sixth Circuit recently had an opportunity to elaborate on in *McQueen v. Beecher Community Schools,* 433 F.3d 460 (6th Cir.2006). The Sixth Circuit, quoting from the Supreme Court's decision in *DeShaney v. Winnebago County Dep't of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), noted that "as a general matter ... a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause," but that certain exceptions have been created. *McQueen,* 433 F.3d at 464 (internal citations and quotation marks omitted). To prevail under the state-created danger theory, Plaintiff must show "an affirmative act [by Defendants] that creates or increases the risk [to Plaintiff]; a special danger to the victim as distinguished from the public at large, and the requisite degree of state culpability." *Id.*

The Court can assume that the second prong of the test, a "special danger," has been met. *See id.* (holding that a material fact had been raised as to whether the danger of one student shooting another while the teacher was out of the room was a special danger). On the other two prongs of the test, however, there are no genuine factual disputes preventing summary judgment in favor of Defendants on the substantive due process claims. ·

Plaintiff cannot show an affirmative act by Defendants that increased the harm to Plaintiff. In ruling on Defendants' motion for judgment on the pleadings, the Court noted that the difference between omissions and affirmative acts was to some degree a matter of semantics, and that accepting everything Defendants said as true, a jury could find that Defendants had acted to place Plaintiff in dangerous situations. Considering the evidence now presented, however, no reasonable jury could find that the behavior Plaintiff is complaining of constituted affirmative acts that increased the risk to Plaintiff.

▮ Recent Sixth Circuit precedent establishes a few relevant propositions. First, as a general matter, the affirmative act requirement has teeth and is not something to be dismissed as semantics when the evidence shows that the standard has not been met. *See id.* at 465 (listing seven cases in the past eight years in which the Sixth Circuit did not find an affirmative act). Second, it is not an affirmative act merely to return a victim to a dangerous situation. *See Bukowski v. City of Akron,* 326 F.3d 702, 710 (6th Cir.2003)(following *DeShaney,* 489 U.S. at 201, 109 S.Ct. 998). Third, attempts by state officials to improve safety do not become actionable affirmative acts merely because harm ends up befalling an affected person. *See Cartwright v. Marine City,* 336 F.3d 487, 493–94 (6th Cir.2003)(holding that transporting

a person from shoulder of highway to convenience store where that person is later raped is not actionable under state-created danger theory because the official's act did not increase the risk).

 Applying those principles to the facts of this case, it is clear that Plaintiff cannot show an affirmative act of the type that creates substantive due process liability. Aside from the clearly non-affirmative acts upon which Plaintiff bases this claim, such as Defendants "refusing to address the actual problem," "ignoring Plaintiff," and not believing Plaintiff, Plaintiff cites Defendants' practices of talking with other students about Plaintiff, monitoring Plaintiff in the hall, and punishing Plaintiff in what Plaintiff contends was a humiliating way, by calling the police. Two of these practices, talking with other students and monitoring Plaintiff in the hallway, were clearly undertaken in an effort to *increase* Plaintiff's safety, and as such cannot be the basis of a state-created danger claim, regardless of whether these practices resulted in negative consequences for Plaintiff.[14] *See id.* at 493–94. As to the third affirmative act, the "punishment" of Plaintiff by calling the police, it is difficult to consider this punishment at all, but to the extent it can be thought of that way, there is no explanation of how this action increased the risk to Plaintiff. Indeed, part of Plaintiff's complaint is addressed to the failure of the school to call the police after fights; presumably this is because Plaintiff and his parents believed that calling the police would increase his safety.

 Even if Plaintiff could satisfy his burden of showing that there was a genuine issue of fact as to whether Defendants' affirmative acts increased the risks to him, there is no evidence upon which a

reasonable jury could find that Defendants acted with the requisite culpability. To state a claim under this theory, Plaintiff must show that the "state must have known or clearly should have known that its actions specifically endangered an individual.... The government's conduct must be so egregious that it can be said to be arbitrary in the constitutional sense." *McQueen,* 433 F.3d at 469 (internal citations and quotation marks omitted). Plaintiff's claims that responding to an incident by talking to Plaintiff's classmates, monitoring Plaintiff, and calling the police constitute egregious conduct cannot be taken seriously when *Plaintiff himself* argues in similar contexts that *not* responding to and investigating incidents, *not* monitoring Plaintiff, and *not* calling the police are themselves instances of discrimination and irrational bias against Plaintiff. Plaintiff has not explained how a reasonable jury could conclude that it was egregious and arbitrary to talk to students, to monitor Plaintiff following his violent "cerebral events," or to call the police after a fight. Therefore, Plaintiff's substantive due process claims must be dismissed.

### E. State Tort Claims

 Plaintiff's outrage claim, also referred to as the intentional infliction of emotional distress claim, must be dismissed for the same reasons Plaintiff's federal claims are without merit. Just as there is no evidence upon which a jury could conclude that Defendants acted in bad faith or with gross misjudgment, there is likewise no evidence upon which a jury could conclude that Vance and Rini's conduct "offends against the generally accepted standards of decency and morality." *Osborne v. Payne,* 31 S.W.3d 911, 913–14

---

**14.** Moreover, Plaintiff's mother has stated that the monitoring worked: while monitored, Plaintiff was not attacked.

(2000). Defendants responded reasonably based on the information they had, and Plaintiff's argument that his kitchen-sink claims (based on monitoring, not monitoring, investigating, not investigating, calling police, not calling police, treating Plaintiff worse than other students, treating Plaintiff better than other students, etc.) demonstrate outrageous conduct that shocks the conscience is not persuasive.

Plaintiff devotes no space in his response brief to defending his negligence claims, and the Court need not address them either, because even if Plaintiff has shown a genuine dispute of material fact as to whether Vance and Rini acted reasonably, they are protected by qualified immunity.

## F. Qualified Immunity

▮▮▮▮ Vance and Rini argue that they have qualified immunity as to the negligence and § 1983 claims.[15] Both Kentucky and federal law provide that a public official or employee is not subject to liability for negligent performance of discretionary acts or functions so long as those acts or functions are undertaken in good faith and within the scope of the individual's authority. *See Harlow v. Fitzgerald,* 457 U.S. 800, 815–18, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Yanero v. Davis,* 65 S.W.3d 510, 521 (Ky.2001). Once a defendant makes a *prima facie* showing that their actions were taken within the scope of their discretionary authority, the burden shifts to the plaintiff to show that the action were taken in bad faith or outside the scope of authority. *See Yanero,* 65 S.W.3d at 523 (following *Wegener v. City of Covington,* 933 F.2d 390, 392 (6th Cir.1991)).

▮▮▮▮ Plaintiff states that Vance and Rini have not met their burden of showing that they acted within the scope of their discretionary authority, but Plaintiff makes no argument as to how their action could be characterized as *not* being within their discretionary authority. There is an overwhelming abundance of case law, both state and federal, holding that official acts by school staff relating to safety and discipline within schools is "inherently discretionary," some of which is even cited by Plaintiff. *See, e.g., M.W. v. Madison Cty. Bd. of Educ.,* 262 F.Supp.2d 737, 747 (E.D.Ky.2003); *James v. Wilson,* 95 S.W.3d 875, 906 (Ky.App.2002). Plaintiff cites no case law and makes no arguments to the contrary; moreover, nothing in Plaintiff's complaint can be read as a claim that Vance or Rini negligently performed a ministerial act. The evidence shows that when incidents were reported, they were investigated and then judgments were made as to how to respond. The Court finds that their actions were the epitome of discretionary actions, and therefore the burden shifts to Plaintiff to prove that Vance and Rini acted in bad faith.

To show bad faith, Plaintiff must show that Vance and Rini knew or should have known that they were violating one or more of Plaintiff's clearly established constitutional rights. *See Lyons v. City of Xenia,* 417 F.3d 565, 571 (6th Cir.2005); *Yanero,* 65 S.W.3d at 522. For the reasons cited above, the Court has found that Plaintiff has not produced any evidence upon which a reasonable jury could find that his rights were violated, and that is in itself sufficient to end the inquiry and determine that Vance and Rini are protected by qualified immunity.

▮▮▮▮ The Court notes, nevertheless, that even if there were evidence creating a genuine issue of fact as to whether Plain-

---

15. For the reasons discussed above, the § 1983 claims are being dismissed for the failure of Plaintiff to produce evidence of discrimination. The qualified immunity analysis, however, provides an alternative ground for dismissal.

tiff's constitutional rights had been violated, the individual capacity claims would still have to be dismissed. A plaintiff only asserts a "clearly established" right when there is a body of "materially similar case law" or, in other words, "a particularized body of precedent that squarely govern[s] the case." *Lyons*, 417 F.3d at 579 (internal citations omitted). Suffice it to say that nowhere in Plaintiff's lengthy response brief has Plaintiff cited a case in which school officials have been held to have violated a student's rights in even remotely similar circumstances. Therefore, any violation of Plaintiff's constitutional rights that had occurred would still not deprive Vance and Rini of their immunity from individual liability.

## V. CONCLUSION

Defendants have demonstrated that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law on all of Plaintiff's claims. No reasonable jury could conclude that Model and its administrators acted in bad faith or with gross misjudgment, or that Vance and Rini violated Plaintiff's clearly established constitutional rights. Accordingly, and for the foregoing reasons, **IT IS ORDERED**:

(1) That Defendants' motion for summary judgment [Record No. 189] be, and the same hereby is, **GRANTED**.

(2) That Plaintiff's claims be, and the same hereby are, **DISMISSED**.