RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 09a0002p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

DAVID PATTERSON and DENA PATTERSON,
            *Plaintiffs-Appellants,*

            *v.*

HUDSON AREA SCHOOLS and KATHY
MALNAR,
            *Defendants-Appellees.*

No. 08-1008

_____

Appeal from the United States District Court

for the Eastern District of Michigan at Detroit.

No. 05-74439—Lawrence P. Zatkoff, District Judge.

Argued:  October 23, 2008

Decided and Filed:  January 6, 2009

Before:  MOORE and WHITE, Circuit Judges; VINSON, District Judge.[*]

_____

**COUNSEL**

**ARGUED:**  Terry E. Heiss, LAW OFFICE OF TERRY E. HEISS, Ada, Michigan, for
Appellants.  Timothy John Mullins, GIARMARCO, MULLINS & HORTON, Troy,
Michigan, for Appellees. **ON BRIEF:**  Terry E. Heiss, LAW OFFICE OF TERRY E.
HEISS, Ada, Michigan, for Appellants.   Timothy John Mullins, GIARMARCO,
MULLINS & HORTON, Troy, Michigan, for Appellees.

        MOORE, J., delivered the opinion of the court, in which WHITE, J., joined.
VINSON, D. J. (pp. 20-34), delivered a separate dissenting opinion.

_____

        [*]The Honorable C. Roger Vinson, United States District Judge for the Northern District of
Florida, sitting by designation.

1

————————————

**OPINION**

————————————

KAREN NELSON MOORE, Circuit Judge.    Plaintiffs-Appellants David Patterson and Dena Patterson (collectively referred to as "the Pattersons"), appeal the district court's grant of summary judgment in favor of Defendant-Appellee Hudson Area Schools ("Hudson") on the Pattersons' claim that Hudson violated Title IX by allowing their son, DP,[1] to be harassed by other students.  The Pattersons' sole argument is that the district court erred in finding that, as a matter of law, Hudson was not deliberately indifferent to the alleged sexual harassment of DP.

Because we believe that the Pattersons have established that there is a genuine issue of material fact as to whether Hudson was deliberately indifferent to the student-on-student sexual harassment of DP, we **REVERSE** the grant of summary judgment and **REMAND** for further proceedings consistent with this opinion.

**I.  FACTS AND PROCEDURE**

Because this case involves a motion for summary judgment, we will detail the facts in the light most favorable to the nonmoving party, the Pattersons.  DP was a student of Hudson schools during all relevant time periods.  Beginning in 2002, during DP's sixth-grade year, various classmates of DP began teasing DP, calling him names, and pushing and shoving him in the hallways.  DP was pushed into lockers and called names such as "queer," "faggot," and "pig" by various students on a daily basis.  Joint Appendix ("J.A.") at 668-70 (DP Dep. at 28-30).  DP reported at least some of these instances to the school and was told "kids will be kids, it's middle school."  J.A. at 672 (DP Dep. at 33).  DP also began receiving psychological treatment from Dr. Gretchen

——————————

[1] All individuals who were minors during the events described herein will be referred to by initials.

Warwick, Ph.D.[2]    According to Dr. Warwick, this harassment caused DP to be distraught, anxious, and angry.

The type of harassment DP faced in sixth grade escalated during DP's seventh-grade year, when he was called names such as "fat," "faggot," "gay," "queer," "pig," and "man boobs" on a daily basis. J.A. at 672-74 (DP Dep. at 33, 36-37). DP believes he was called these names more than 200 times during his seventh-grade year. He also was frequently pushed in the hallways. Additionally, DP was called "Mr. Clean" by his peers, a derogatory term that referred to DP's supposed lack of pubic hair.

On one occasion, DP attempted to stop a female classmate, BC, from tormenting another student. In response, BC slapped DP. Though, upon learning about the incident, band teacher Crystal Bough, told DP she "w[ould] take care of it," the Pattersons were never contacted by the school, nor did Ms. Bough report the incident to the principal. J.A. at 678-79 (DP Dep. at 44-45). The Pattersons learned from DP that he had been assaulted at school. This incident led to further teasing, including teasing from geography teacher John Redding, who asked DP later that same day in front of a full class of students: "[H]ow does it feel to be hit by a girl[?]" J.A. at 680 (DP Dep. at 46). The class laughed at DP.

DP wanted to quit school by the end of the first semester of seventh grade. Principal Greg Rozeveld[3] offered to mentor DP through this hard time. However, according to Mrs. Patterson, when DP first began to meet with Principal Rozeveld, DP was released from class early to attend the meeting. The first visit went smoothly, but Principal Rozeveld was not in his office when DP arrived for the next three visits. On these occasions, DP would return to class, which caused the teacher to decide to stop sending DP early to meet with Principal Rozeveld. Instead, she waited until she released the problem students to go to the office to have their planners signed at the end of the

---

[2]Dr. Warwick also treated DP when he was ten years old for problems stemming from his family life. DP was no longer suffering from those problems when the teasing began in sixth grade.

[3]The principal's name is repeatedly misspelled in Hudson's brief and the depositions as "Roosevelt."

school day.  After only a couple of weeks, DP expressed to Mrs. Patterson that he no longer wanted to go with the problem students because other students were beginning to think he was a trouble-maker.  DP stopped going to meet with Principal Rozeveld shortly thereafter.

These incidents caused DP to withdraw to the point that he began eating lunch in the bandroom by himself to avoid his tormentors.  His interim grades were also low; however, DP did receive higher final grades.

The Pattersons and DP repeatedly reported several incidents of harassment to Hudson.  As the district court accurately detailed, DP and the Pattersons reported the following incidents:

1. Sixth Grade:

   a.    Dave Patterson spoke to a teacher about teasing directed at [DP] and how [DP] felt upset and humiliated.

   b.    [The Pattersons] attended parent teacher conferences to talk about the name calling, etc.

   c.    [The Pattersons] met with Principal Rozeveld to discuss the pushing, shoving and name calling of [DP].

2. Seventh Grade:

   a.    [The Pattersons] and school counselor Susan Mansfield ("Ms. Mansfield") discussed the fact that [DP] was having a hard time at school in November and/or December, 2002.

   b.    [The Pattersons] and several teachers met to discuss [DP]'s anxiety about being (i) bullied and teased, (ii) the victim of sexually offensive name calling, and (iii) pushed into lockers.

   c.    [The Pattersons] met with Principal Rozeveld just before Christmas 2002 about [DP] not wanting to come back to school because of teasing, bullying, and being called "gay", "fag", "queer."  [The Pattersons] also discussed the impact of those things on [DP]'s schooling, his feelings of being ostracized and his suffering grades. Names of perpetrators allegedly were provided.  They

> also discussed the incident of [DP] being slapped by [BC] and Mr. Redding teasing [DP] about it.
>
> d.     During the second semester of seventh grade, [the Pattersons] discussed problems [DP] endured with Ms. Mansfield and other staff.
>
> e.     [The Pattersons] communicated with school staff throughout [DP]'s seventh grade year over academic and social issues. The [Pattersons] asked staff what, if anything, [DP] was doing to cause his peers to tease and taunt him. [The Pattersons] claim that they were told consistently that [DP] was doing nothing wrong.

*Patterson v. Hudson Area Schools*, No. 05-74439, 2007 WL 4201137, *1-2 (E.D. Mich. Nov. 28, 2007) (unpublished opinion and order).

During the summer between seventh grade and eighth grade, Ms. Mansfield, along with social worker Tammy Cates, filled out a referral form to have DP evaluated for special education services. This evaluation established that DP is emotionally impaired as defined by the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq. An Individual Education Placement Team was convened and an individual education program was developed. Pursuant to the program, DP was assigned to attend teacher Ted Adams's resource room during one period of the day for all of the eighth-grade year. Mr. Adams was helpful in teaching DP how to cope with his peers. All parties agree that DP had a successful eighth-grade year; by using the resource room, DP was able to learn effectively.

However, DP's ninth-grade year was not successful. DP's individual education program was altered by Hudson. Notably, Hudson High School Principal Michael Osborne refused to allow DP to continue in Mr. Adams's resource room because Mr. Adams was a middle-school resource-room teacher. Because DP's eighth-grade year was so successful, the Pattersons begged Hudson to allow DP to continue in Mr. Adams's resource room, and even offered to have DP go to the middle school to meet

with Mr. Adams in Mr. Adams's room, but this request was to no avail.[4]  Principal Osborne also "didn't think that [the high school resource room] was the place for [DP]." J.A. at 856 (Mrs. Patterson Dep. at 138).  Thus, DP was not placed in any resource room for his ninth-grade year.

The beginning of his ninth-grade year brought a return of the type of harassment DP faced in sixth and seventh grade.  DP was again called names such as "gay," "fat," "fag," and "queer" and was pushed and shoved in the hallways on a near daily basis. J.A. at 729-30 (DP Dep. at 106-07).  That fall, DP also was called "Mr. Clean" by three students.  Those students were forced to meet with DP and Ms. Mansfield.  The students apologized, but DP did not think their apology was sincere.  Those three students never bothered DP again.

DP also experienced new types of harassment during his ninth-grade year. During oral presentations in history class, a fellow student, SE, wrote a series of words on the back of his note cards.  These words created the phrase:  "[DP] is a fag." J.A. at 708 (DP Dep. at 85).  The entire class saw this phrase as the student used the cards for his presentation, which caused the students to laugh at DP.  SE was reported to Ms. Mansfield and the history teacher, both of whom verbally reprimanded SE.  SE never bothered DP again.

Shortly after the oral presentation incident, another student, JR, defaced DP's planner with the sexual phrases "I ❤ penis," "I lick it in the Ass," "I ❤ cock," and "I'm a mamma's boy/I suck on her Nipple" and drawings of buttocks and a penis.  J.A. at 311 (Planner); J.A. at 721-24 (DP Dep. at 98-101).  DP reported this incident to both the teacher and Principal Osborne.  JR was verbally reprimanded by Ms. Mansfield and did not bother DP again after this incident.

---

[4]Though Mr. Adams worked for the middle school, the middle school and high school are housed in the same building, segregated into separate wings.  According to DP, it was possible for him to stop by and meet with Mr. Adams in Mr. Adams's room even after DP began high school.  Mr. Adams did volunteer to counsel DP for 25-30 minutes per week after DP began his ninth-grade year.

In March 2005, unknown students broke into DP's gym locker, removed his clothes and urinated on them, and threw his tennis shoes in the toilet. The locker was also "covered with shaving cream spelling out sexually oriented words." J.A. at 152 (TW Aff. ¶ 14). Later that spring, two students, KM and JL, hung a "Mr. Clean" poster on DP's locker in the main hallway. Principal Osborne verbally reprimanded KM, and suspended JL for one day. JL's tougher punishment was due to the fact that he had previously violated school rules in a manner unrelated to the "Mr. Clean" incident. Neither student bothered DP thereafter.

At some point after the "Mr. Clean" incident, DP's locker in the main hallway was vandalized by unknown students. These students used permanent markers and wrote words such as "gay," "faggot," and "queer" up and down the locker. J.A. at 805 (Mr. Patterson Dep. at 55). Additionally, a picture of a penis being inserted into a rectum was drawn on the locker. The inside of the locker was also defaced with various derogatory phrases, such as "suck your mother's tits" and "you suck dicks." *Id.* After the Pattersons reported the incident, Hudson officials cleaned the outside of the locker; DP had to ask Mr. Adams to help him clean the inside of the locker. Hudson conducted an investigation, but no individuals were ever punished.

The final incident of harassment occurred in late May 2005. After Friday night junior-varsity baseball practice, DP was sexually assaulted by a fellow teammate, LP, in the locker room. LP stripped naked, forced DP into a corner, jumped on DP's shoulders, and rubbed his penis and scrotum on DP's neck and face. While the assault was occurring, another student, NH, blocked the exit so DP could not escape. DP informed the Pattersons that evening about the attack. DP also informed Andy Wade, his older brother and coach of the junior-varsity baseball team. The Pattersons informed Principal Osborne about the event on Saturday, during a baseball double-header. Both DP and LP played in the double-header, but DP claims he participated in the game only in order to prevent the team from having to forfeit.

LP was allowed to attend school on Monday morning while Hudson officials began investigating the incident. At some point on Monday, LP was suspended for the remainder of the school year (just over eight days). However, LP was permitted to attend the annual spring sports banquet, one week after the assault. Principal Osborne told Mr. Wade "to treat [LP] like any other player, to shake his hand as [Mr. Wade] would other players and to act like nothing happened." J.A. at 233 (Wade Aff. ¶ 23). On June 10, 2005, LP was charged with assault with intent to commit a felony and criminal sexual conduct in the second degree. He ultimately pleaded guilty to disorderly conduct. He was formally expelled from Hudson in August 2005 and has not been permitted to re-enter the Hudson school system. NH was verbally reprimanded for his role in the assault. No criminal charges were filed against NH.

After the sexual assault, the varsity baseball coach, Jeremy Beal, held a team meeting with both the junior varsity and the varsity baseball players. At the meeting, Mr. Beal informed the players that they should "'not joke around with guys who can't take a man joke.'" J.A. at 153 (TW Aff. ¶ 24 (quoting Mr. Beal)). DP was present at the meeting.

Due to the continued harassment at Hudson, culminating in a sexual assault, DP claims that he has been psychologically unable to set foot into a Hudson school building since the end of his ninth-grade year. At the end of ninth grade, DP's individual education program was modified. For his tenth-grade year, "[DP] began receiving instructional services from [Hudson] in the Sacred Heart School building," a preschool-through-sixth-grade Catholic elementary school. J.A. at 160 (Johnston Aff. ¶ 36). DP's high-school teachers would visit him occasionally to discuss his assignments, even though "[DP] made numerous attempts to e-mail teachers and did not get responses." J.A. at 157 (Johnston Aff. ¶ 17). This year was not successful for DP.

For his eleventh- and twelfth-grade years, Hudson allowed DP to take college placement courses at the local college. Originally, Hudson decided that one semester of college coursework would equal one semester of high school course work. However, after Hudson was required to pay tuition, "[t]he standard changed to one semester college class equals one year high school class . . . ." J.A. at 197 (Mrs. Patterson Aff. ¶ 7). This facilitated DP's early graduation.

The Pattersons filed suit against Hudson and Kathy Malnar, Superintendent of Schools for Hudson, in the United States District Court for the Eastern District of Michigan on November 22, 2005. The complaint alleged the following federal claims: (1) Hudson violated Title IX of the Education Amendments of 1972; (2) Hudson violated DP's equal-protection rights; and (3) Ms. Malnar "failed to implement and enforce meaningful procedures to ensure compliance with federal law and the policies of [Hudson] and failed to ensure the proper education and training of staff as to harassment issues." J.A. at 17 (Compl. ¶¶ 28-30). The complaint also alleged various state claims.

Hudson and Malnar moved for summary judgment with respect to all claims, which the district court granted. *Patterson*, 2007 WL 4201137, at *13. With respect to the Title IX claim against Hudson,[5] the district court applied the three-part test expressed in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), as articulated by this court in *Vance v. Spencer County Public School District*, 231 F.3d 253 (6th Cir. 2000). *Patterson*, 2007 WL 4201137, at *12. The district court determined that the Pattersons had met their burden with regard to the first two parts of the test, but that the Pattersons failed to show, as a matter of law, that Hudson's responses to DP's reported attacks were "clearly unreasonable in light of known circumstances." *Id.* The district court concluded that, absent such a showing, the Pattersons could not prove that Hudson was "deliberately indifferent to the alleged sexual harassment," and thus summary judgment was appropriate. *Id.* The district court stressed that each time DP or the Pattersons reported an incident and Hudson knew who the perpetrators were, Hudson

---

[5]The district court dismissed the Title IX claim against Superintendent Malnar with the observation that "there is no individual liability for a Title IX claim." *Patterson*, 2007 WL 4201137, at *5 n.2. The Pattersons do not appeal this dismissal.

reprimanded or punished those individuals, who later did not bother DP. *Id*. at *8-9. The district court further credited Hudson with implementing several proactive programs to combat harassment and bullying and with "assist[ing DP] in dealing with the issues he faced in their schools." *Id*. at *10. The Pattersons timely appealed, arguing only that the district court erred in determining that, as a matter of law, Hudson was not deliberately indifferent. Thus, on appeal, we consider only the Title IX claim against Hudson.

## II.  ANALYSIS

### A.  Summary Judgment Standard of Review

We review de novo a district court's grant of summary judgment. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). Under Rule 56(c), summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In deciding upon a motion for summary judgment, we must view the factual evidence and draw all reasonable inferences in favor of the non-moving party." *Nat'l Enters., Inc. v. Smith*, 114 F.3d 561, 563 (6th Cir. 1997). "'We examine the grant of summary judgment to determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *DiCarlo*, 358 F.3d at 414 (quoting *C.T. Massey v. Exxon Corp.*, 942 F.2d 340, 342 (6th Cir.1991)) (second set of internal quotation marks omitted).

### B.  Title IX Claim

Title IX provides that, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681. Title IX can support a cause of action for a student's claim of student-on-student sexual harassment against a recipient of federal funds.

*Davis*, 526 U.S. at 633. To establish a prima facie case of student-on-student sexual harassment, the plaintiff must demonstrate each of the following elements:

(1)     the sexual harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school,

(2)     the funding recipient had actual knowledge of the sexual harassment, and

(3)     the funding recipient was deliberately indifferent to the harassment.

*Vance*, 231 F.3d at 258-59 (quoting *Soper v. Hoben*, 195 F.3d 845, 854 (6th Cir. 1999) (citing *Davis*, 526 U.S. at 633)).

The district court found that the Pattersons met their burden with regard to parts one and two of the test, but that, as a matter of law, the Pattersons did not establish that Hudson was "deliberately indifferent to the alleged sexual harassment against [DP]." *Patterson*, 2007 WL 4201137, at *12. The only issue on appeal is whether Hudson's actions require us to hold, as a matter of law, that Hudson has not acted with deliberate indifference. We conclude that, viewing the evidence in the light most favorable to the

Pattersons,[6] the Pattersons have demonstrated a genuine issue of material fact regarding whether Hudson's actions were deliberately indifferent.

A recipient of federal funds that remains "deliberately indifferent to known acts of harassment" is liable for damages under Title IX. *Vance*, 231 F.3d at 260. "[T]he deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." *Id.* (quoting *Davis*, 526 U.S. at 645) (first alteration in *Vance*, second alteration in *Davis*). "[A] plaintiff may demonstrate [a] defendant's deliberate indifference to discrimination 'only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'" *Vance*, 231 F.3d at 260 (quoting *Davis*, 526 U.S. at 648). A recipient need not "[purge its] schools of actionable peer harassment" or "engage in particular

---

[6] This is a diametrically different approach than the one taken by the dissent. Although the dissent professes to be using the correct legal standard, it repeatedly weighs evidence and decides controverted issues in favor of Hudson, the moving party. *See, e.g.*, Dissent at 24-25 (deciding that the resource room is nothing more than "the equivalent of study hall" and, therefore, could not cause a reduction of harassment); 25-26 (belittling the Pattersons' evidence in regard to the lack of and effectiveness of proactive programs). When we review a grant of summary judgment, we are forbidden to weigh the evidence or to draw the inferences the dissent insists upon drawing. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are *jury functions*, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (emphasis added)). Our job is to look at the facts and consider them in the light most favorable to the nonmoving party, regardless of our own personal views of how much credence we would give a particular piece of evidence if we were on a jury. The dissent's steadfast determination to act as a juror is contrary to Supreme Court precedent.
    A clear example of the dissent's misunderstanding and misapplication of the governing standard is found in the assertion that the undisputed facts support a conclusion that the resource room itself did nothing to reduce the harassment of DP. The record clearly shows and both parties admit that, when the resource room was used, DP suffered less harassment. Whether it was the use of the room or the person who ran the room that caused this undisputed decreased harassment is a question of interpretation. Because we must draw all inferences in favor of the nonmoving party, it is legally incorrect for the dissent to infer that Mr. Adams himself, and not the use of the resource room in general, aided DP. This same evidence supports the inference that it was the use of the resource room itself that was beneficial to DP and, because that inference favors the Pattersons, that is the inference the Supreme Court demands we draw. The dissent's repeated claim, unsupported by the record, that all the inferences it draws in Hudson's favor are "established by the undisputed facts," *see, e.g.*, Dissent at 24, does not magically give the dissent carte blanche to view controverted issues in the light most favorable to Hudson.
    Furthermore, even assuming that the inference that the dissent insists upon drawing was legally permissible, we believe that a reasonable juror could still find that Hudson was deliberately indifferent. Although Mr. Adams worked for the middle school, the middle school and the high school were housed in the same building, "connected by a short hall." J.A. at 697 (DP Dep. at 74). DP testified that, during his ninth-grade year, it was possible for him to meet Mr. Adams on the same basis he did while in middle school. Additionally, Mrs. Patterson testified that the Pattersons "begged" Hudson to allow DP to meet with Mr. Adams and even offered to have DP meet with Mr. Adams in Mr. Adams's room in the middle school. J.A. at 855 (Mrs. Patterson Dep. at 137). Given the effectiveness of the eighth-grade resource room and the willingness of the Pattersons to have DP go back to the middle school to utilize Mr. Adams's services, a reasonable juror could conclude that Hudson's refusal to continue the resource room program for DP constitutes deliberate indifference.

disciplinary action" to avoid Title IX liability. *Vance*, 231 F.3d at 260. "Furthermore, courts should not second guess the disciplinary decisions that school administrators make." *Id*. at 260. However:

> where a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior. *Where a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances.*

*Id*. at 261 (emphasis added).

Relying on this language, one district court determined that, where a student suffered four years of harassment from various other students, a school district's "tactic of merely talking to and warning students who harassed plaintiff," with occasional investigation into "some of the more significant incidents and even eventually proactively sp[eaking] to students and teachers in an effort to prevent further incidents . . . raised a genuine issue of material fact sufficient to withstand summary judgment." *Theno v. Tonganoxie Unified Sch. Dist. No. 464*, 377 F. Supp. 2d 952, 966 (D. Kan. 2005). *Theno* is illustrative. In *Theno*, the plaintiff was repeatedly harassed beginning in his seventh-grade year and ending only when he left school during his eleventh-grade year. *Id*. at 954-61. The harassment consisted of name calling ("faggot," "queer," "pussy," "jack-off boy," etc.), persistent joking regarding plaintiff being caught masturbating in the school bathroom (which was untrue), and some physical altercations (pushing, shoving, tripping, fistfights). *Id*. Most student harassers were merely given verbal warnings or reprimanded by the school; however, a few of the more serious offenders were more severely disciplined. *Id*. Importantly, "each time the school disciplined a known harasser, to the best of the school's knowledge that particular harasser ceased harassing plaintiff (with limited exceptions)." *Id*. at 965. The school also began to speak proactively with students and teachers regarding harassment during the plaintiff's tenth-grade year. *Id*. at 959-60.

The school district in *Theno* argued that, as a matter of law, its responses could not be deemed clearly unreasonable. *Id*. at 965. The district court disagreed, stressing that

> this is not a case that involved a few discrete incidents of harassment. It involved severe and pervasive harassment that lasted for years, with other students engaging in the same form of harassment after those who were counseled had stopped, and the school rarely took any disciplinary measures above and beyond merely talking to and warning the harassers.

*Id*. at 966. Though the school took more aggressive measures in the later years of the harassment, the district court noted that

> [b]y that time, the harassment had been going on for a number of years without the school handing out any meaningful disciplinary measures to deter other students from perpetuating the cycle of harassment. While the court recognizes that the school was not legally obligated to put an end to the harassment, *a reasonable jury certainly could conclude that at some point during the four-year period of harassment the school district's standard and ineffective response to the known harassment became clearly unreasonable*.

*Id*. (emphasis added). The district court cited *Vance* to support this determination. *Id.* It also concluded that *Vance* supported a finding that "whether the school's belatedly stepped-up efforts were 'too little, too late' is a question for the jury." *Id*.

*Theno*'s reliance on *Vance* is persuasive.[7]  In *Vance*, when confronted with a post-trial motion for judgment as a matter of law, the district court upheld the jury verdict in favor of the plaintiff, a female student who suffered harassment over many school years perpetrated by various students, and we affirmed.  *Vance*, 231 F.3d at 256-58.  The school district responded to the plaintiff's harassment complaints by talking to the perpetrators, to no avail.  *Id.* at 262.  We rejected the defendant's argument that a

---

[7]Contrary to the dissent's assertion, we rely on *Vance* in making our holding.  However, one cannot escape the striking similarities between the instant case and *Theno*, a case that also relied on *Vance*. The dissent's attempt to minimize the usefulness of district court opinions does not change this fact.  We therefore believe that *Theno* is a helpful tool to illustrate why the holding in *Vance* supports our holding today.

More important, the case the dissent cites as "very similar and persuasive," Dissent at 29, *Doe v. Bellefonte Area School District*, 106 F. App'x 798 (3d Cir. 2004), an unpublished Third Circuit opinion, is different from this case in two material respects.  First, in *Doe*, the school district did more to prevent the systematic harassment of Doe than Hudson did in instant case.  Specifically, the school district gave Doe "a special means of reporting any additional harassment," circulated memoranda specific to Doe's harassment issues to the faculty in the hopes of preventing future harassment, and "held assemblies and enacted policies addressing peer-to-peer harassment."  *Doe*, 106 F. App'x at 800.  As outlined above, when viewing the facts in the light most favorable to the Pattersons, we observe that Hudson did not perform any of these services during DP's ninth-grade year.  Thus, *Doe* is distinguishable from the instant case by the effort the school district devoted to preventing future harassment.

Second, and of greater weight, is the fact that the Third Circuit is not bound by *Vance*, and thus *Doe* is of little value.  Moreover, the dissent's contention that *Doe* tacitly rejected our interpretation of *Vance* is unavailing, given that the actual opinion in *Doe* makes no mention of *Vance*.  Therefore, even if the *Doe* panel thoroughly considered and rejected this interpretation of *Vance*, *Doe* provides no reasoning regarding why it hypothetically rejected that interpretation that we may consider and evaluate.

Furthermore, the dissent's assertion that "a decision of a three-judge panel from a sister court of appeals has to be more persuasive than a single district judge's opinion from outside this circuit," Dissent at 29 n.7, is completely unfounded and demeaning to district court jurists.  Under such a theory, a decision from Learned Hand while sitting on the bench in the Southern District of New York would be categorically inferior to any differing opinion rendered by a random three-judge panel from any circuit.  Judges and cases differ, and such a bright-line rule that imports inferiority without regard to the depth of analysis present in an opinion or to the similarity of facts with the case at bar is unwarranted and disrespectful to the numerous talented district judges.

Additionally, the dissent's reliance on *S.S. v. Eastern Kentucky University*, 532 F.3d 445 (6th Cir. 2008), is misplaced.  *S.S.* involved a student claiming peer-on-peer harassment in violation of the Americans with Disabilities Act and § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.  The panel applied the *Davis* test to the claim and held that the school district was not deliberately indifferent as a matter of law.  However, the school district in *S.S.*, like the school district in *Doe*, did more than Hudson did in this case to prevent future harassment:  The school district "arrang[ed] for outside speakers to talk to the students about name-calling, identif[ied] related topics for discussion at school assemblies and in small groups," "call[ed] the police," and "call[ed] the other students' . . . parents to discuss the disciplinary problems."  *S.S.*, 532 F.3d at 455.  The dissent insists that both *Doe* and *S.S.* are factually identical to this case, claiming that Hudson has done everything that the school districts in those two cases have done. Dissent at 29-33 & n.8.  However, that is true only if one views the evidence in the light most favorable to Hudson, not when one views the evidence in the light most favorable to the Pattersons.  Because the latter is the legally correct view, Hudson is not on par with the school districts in *Doe* and *S.S.*

Moreover, the panel in *S.S.* stressed that "[e]ven viewing the record in the light most favorable to S.S., proof is lacking as to what [the defendant] could have or should have done differently in order to bring the peer-on-peer harassment to a stop."  *Id.*  As explained below, that is not the case in the instant appeal; it is undisputed that Hudson was fully aware that use of the resource room in eighth grade impacted the amount of harassment that DP suffered and discontinuing the resource room in ninth grade correlated with a return to high levels of harassment.  Hudson Br. at 8-22.  Thus, a reasonable jury could find that Hudson knew how to combat the harassment of DP and simply chose not to implement that known method of success.  Thus, *S.S.* is distinguishable.

school district is not deliberately indifferent "as long as a school district does something in response to harassment," *id*. at 260, emphasizing that "once [a school district] had knowledge that its response was inadequate, it was required to take further reasonable action in light of the circumstances to avoid new liability," *id*. at 262. We believe this language makes clear that, even though a school district takes some action in response to known harassment, if further harassment continues, a jury is not precluded by law from finding that the school district's response is clearly unreasonable. We cannot say that, as a matter of law, a school district is shielded from liability if that school district knows that its methods of response to harassment, though effective against an individual harasser, are ineffective against persistent harassment against a single student. Such a situation raises a genuine issue of material fact for a jury to decide.

Furthermore, when viewing the facts in the light most favorable to the Pattersons, we conclude that there are striking similarities between the instant case and *Theno*. Here, as in *Theno*, DP was repeatedly harassed over a number of years. Hudson responded to this harassment largely by giving verbal reprimands to the perpetrators. Though typically reprimands largely stopped harassment by the reprimanded student, they did not stop other students from harassing DP. This pervasive harassment escalated to criminal sexual assault. Moreover, Hudson was aware that the verbal reprimands regarding a few students were not stopping the overall harassment of DP; it is undisputed that DP continued to have problems with other students, even after some were reprimanded or even disciplined, and DP reported those continuing problems to Hudson. Hudson Br. at 8-22 (detailing DP's reported harassment).

One key difference between *Theno* and this case is that Hudson did at one point employ a system that successfully combated the harassment of DP, i.e., the use of the resource room during eighth grade. In the instant case, a reasonable jury could thus conclude that Hudson not only was aware of what did not work, but also was aware of what had worked to insulate DP from the harassment. However, in ninth grade, Hudson discontinued the use of the resource room. The cycle of harassment then intensified, and Hudson's only response was to employ the same type of verbal reprimands that it had

used unsuccessfully in response to the sixth- and seventh-grade harassment. Given that Hudson knew that its methods were ineffective, but did not change those methods, "a reasonable jury certainly could conclude that at some point during the . . . period of harassment[,] the school district's standard and ineffective response to the known harassment became clearly unreasonable." *Theno*, 377 F. Supp. 2d at 966.

Hudson makes several arguments claiming that its actions were not clearly unreasonable as a matter of law, none of which are persuasive. Notably, Hudson does not attempt to distinguish *Theno* from the instant case, but rather cites four different district court cases it believes are more instructive. Each of these cases is distinguishable from the instant case or espouses law contrary to our precedent.[8]

The thrust of Hudson's argument is that Hudson dealt successfully with each identified perpetrator; therefore, it asserts that it cannot be liable under Title IX as a matter of law. This argument misses the point.[9] As explained above, Hudson's success with individual students did not prevent the overall and continuing harassment of DP, a fact of which Hudson was fully aware, and thus Hudson's isolated success with individual perpetrators cannot shield Hudson from liability as a matter of law. *Theno*,

---

[8] *Johnson v. Independent School District No. 47*, 194 F. Supp. 2d 939 (D. Minn. 2002), involved an inappropriate phrase ("one time at band camp") placed next to a picture in the school yearbook of plaintiff playing her flute. *Id.* at 941-43. When the school became aware of the sexual nature of the phrase, it attempted to cover the phrase with nonremovable stickers, a technique that was successful in the past. *Id.* at 942-43. Unfortunately, the stickers proved to be easily removable. *Id.* *Johnson* is distinguishable from the instant case because Hudson, when confronted with harassment of DP in ninth grade, implemented a system that it knew from past experience did not work.

Hudson also cites *Johnson* and *Wilson v. Beaumont Independent School District*, 144 F. Supp. 2d 690 (E.D. Tex. 2001), for the proposition that so long as a school district takes some action, that is enough to show that the school district was not deliberately indifferent. Hudson Br. at 30-31. We rejected this proposition in *Vance*. *Vance*, 231 F.3d at 260.

Finally, Hudson cites *KF's Father v. Marriott*, No. CA 00-0215-C, 2007 WL 228353 (S.D. Ala. Feb. 23, 2001), and *Vaird v. School District of Philadelphia*, No. CIV. A. 99-2727, 2000 WL 576441 (E.D. Pa. May 12, 2000), as examples of what does not constitute deliberate indifference; however, these cases are both distinguishable because both involved only one perpetrator, not harassment by several individuals aimed at a single student. *KF's Father*, 2007 WL 228353, at *16; *Vaird*, 2000 WL 576441, at *1.

[9] The dissent likewise misses this point. On four separate occasions, the dissent claims that Hudson was "100% effective" in dealing with the harassment of DP. Dissent at 22, 28, 29, 33. However, one can make such a statement only if he ignores the realities of DP's situation. The reprimands of a few individual harassers did not stop harassment by the many, and it is undisputed that Hudson was aware of this fact. Hudson Br. at 8-22 (detailing DP's reported harassment). *Vance* teaches that, in such circumstances, a jury may legally find that a school district has "failed to act reasonably in light of the known circumstances." *Vance*, 231 F.3d at 261.

377 F. Supp. 2d at 966. It is for a jury to decide whether Hudson's actions were "clearly unreasonable." *Davis*, 526 U.S. at 649.

Hudson also asserts that it proactively dealt with the issue of harassment and bullying through a sexual-harassment policy in the student handbook, from which teachers and students were instructed, and school-wide programing dealing with harassment and bullying. However, viewing the facts in the light most favorable to the Pattersons, we cannot consider any of Hudson's claimed programs.[10]

Although Hudson's brief and oral argument before us attempted to minimize the harassment suffered by DP, Hudson does not argue that the district court improperly found that the Pattersons had met their burden of showing that the harassment of DP was severe and pervasive. Thus, we do not consider this issue. Therefore, we hold that, because Hudson had knowledge that its methods for dealing with the overall student-on-student sexual harassment of DP were ineffective, but continued to employ only those methods, the Pattersons have shown a genuine issue of material fact as to the third part of the *Davis* test that is sufficient to defeat Hudson's motion for summary judgment.

We emphasize that, at this stage of the litigation, the Pattersons are not required to prove that Hudson is actually liable for the continued harassment of DP (i.e., that Hudson's actions were clearly unreasonable), but only that there is a genuine issue of material fact as to whether Hudson was deliberately indifferent to the harassment. In

---

[10]First, the Pattersons presented evidence that the sexual-harassment policy was not explained to every student and teacher. *See, e.g.*, J.A. at 145 (Kline Aff. ¶ 10); J.A. at 228 (Wade Aff. ¶¶ 9.a-9.b). Second, of the programs listed by Hudson—"Character Counts," "40 Developmental Assets," "Bang, Bang, You're Dead," the speakers series, the individual and group counseling sessions, "Flirting and Hurting Program," "Concerned About Teen Sexuality ('CATS') Program," "Peer Mediation Program," and "Positive Peers"—the only ones that actually dealt with student-on-student sexual harassment and bullying (as opposed to sexual relationships between males and females) and were actually implemented were "Bang, Bang, You're Dead" and "Flirting and Hurting." *See* J.A. at 285 (Stutzky Aff. ¶ 7.c.vii); J.A. at 493-98 (Mansfield Dep. at 27-32). Third, the Pattersons' expert explained that one-time events such as "Bang, Bang, You're Dead," "no matter how powerfully presented, have not been demonstrated to have a significant lasting impact on a school's climate or culture or reducing or eliminating bullying or harassment." J.A. at 285 (Stutzky Aff. ¶ 7.c.viii). Fourth, the Pattersons presented evidence that the "Flirting and Hurting" program was not always taught to students. *Compare* J.A. at 228-230 (Wade Aff. ¶¶ 9 and 9.e) (stating that Wade taught health during the 2004-2005 school year and did not teach the "Flirting and Hurting" program), *with* J.A. at 495-97 (Mansfield Dep. at 29-31) (explaining that "Flirting and Hurting" was integrated into health classes in the 2003-2004 school year). Thus, when viewing these programs in the light most favorable to the Pattersons, we must assume that Hudson was not engaged in any proactive activities.

other words, the Pattersons must show only that a reasonably jury *could* find that Hudson violated Title IX.  Viewing the facts in the light most favorable to the Pattersons, we believe the Pattersons have met this burden.

### III.  CONCLUSION

Because we conclude that the Pattersons have demonstrated that there is a genuine issue of material fact as to whether Hudson's responses to DP's reported student-on-student sexual harassment were clearly unreasonable in light of the known circumstances, we **REVERSE** the grant of summary judgment and **REMAND** for further proceedings consistent with this opinion.

---

**DISSENT**

---

VINSON, District Judge, dissenting.  I disagree. The single issue in this appeal is whether there is a genuine issue of material fact as to whether the defendant, Hudson Area Schools, was deliberately indifferent to the harassment directed at DP. A school district is not deliberately indifferent unless it knows of and disregards an excessive risk to the student's health or safety. *See Farmer v. Brennan,* 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).[1] It must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and, further, it must actually draw that inference. *See id.* Deliberate indifference presupposes that the school knows of a Title IX violation, but it "refuses to take action to bring the recipient into compliance. The premise, in other words, is an official decision by the recipient not to remedy the violation." *Gebser v. Lago Vista Indep. School Dist.,* 524 U.S. 274, 290, 118 S. Ct. 1989, 141 L. Ed. 2d 277 (1998); *see also, e.g., Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 651, 654, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999) (deliberate indifference established when school district knows of peer harassment, but it "refus[es] to take any action" and "ma[kes] no effort whatsoever" to end the harassment); *accord Horner v. Kentucky High School Athletic Ass'n,* 206 F.3d 685, 692 (6th Cir. 2000) (noting that deliberate indifference is shown when "school officials are aware of the misconduct *but do nothing to stop it.* . .") (emphasis added).

This standard "does not mean a collection of sloppy, or even reckless, oversights; it means evidence showing an obvious, deliberate indifference to [the] abuse." *See Doe v. Claiborne County, Tenn.,* 103 F.3d 495, 508 (6th Cir. 1996). Ultimately, a Title IX recipient is deliberately indifferent to peer-on-peer harassment "only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *See Davis, supra,* 526 U.S. at 648. The response must be of

---

[1] *Farmer* is an Eighth Amendment prisoner case, but the standard is "applicable to the school context." *Williams ex rel. Hart v. Paint Valley Local School Dist.,* 400 F.3d 360, 368 (6th Cir. 2005).

such a degree that it facilitated or "subjected" the victim to harassment. *See id.* at 644-47. Although this is a sad case, the plaintiffs have clearly not met the high legal standard for deliberate indifference. *See Gebser, supra,* 524 U.S. at 304 (Stevens, J., dissenting) (noting that only "few Title IX plaintiffs . . . will be able to recover damages under this exceedingly high standard").[2]

The relevant inquiry in determining whether the school district was deliberately indifferent is to examine its responses to the *known* instances of harassment. DP claims that he was harassed almost every day, but the record reflects that he did not report much of the harassment.[3] When he did report the harassment at times throughout the years, he sometimes could not identify the harassers.[4] Obviously, the school district is not responsible for failing to stop harassment of which it was not made aware, nor can it be held responsible for failing to punish harassment by unknown individuals.

When DP complained and the harassers were identified, however, the defendant responded to each incident with action appropriate to the nature and severity of the harassment. The students who called DP "Mr. Clean" were taken to the school counselor's office for a meeting with DP, where they were counseled and then apologized. The student who wrote the offensive remarks on the back of his note cards

---

[2] The Supreme Court has emphasized that courts "must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults. Indeed, at least early on, students are still learning how to interact appropriately with their peers." *See Davis, supra,* 526 U.S. at 651 (citation omitted). I do not minimize the harassment at issue for it was very serious, but it appears that at least some of DP's peer-related problems were caused by his heightened sensitivity to the unfortunate reality that "in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it." *See id.* at 651-52. According to his teachers, DP was at times highly sensitive and had poor social skills which made it difficult for him to "distinguish[] between camaraderie and being picked on," which, in turn, alienated him from the other students. *See* Joint Appendix ("J.A.") at 553-54; *accord id.* at 102. It should be noted that these socialization and peer-related problems existed long before he entered the Hudson school district, apparently even dating back to daycare. *See id.* at 532.

[3] To point to one example, the majority states that DP was teased, called names, and pushed and shoved "on a daily basis" while he was in the sixth grade. Maj. Op. at 2. Despite the daily nature of this harassment, DP admits that he made only "a total of a couple reports regarding [the] incidents that took place" during that school year: one or two reports to Principal Greg Rozeveld and teacher Gwen Marry. *See* J.A. at 648.

[4] DP was unable to say, for example, who vandalized his hall locker. The school conducted an investigation into the matter, as the majority acknowledges, *see* Maj. Op. at 7, but it was unable to determine who was responsible.

was swiftly reprimanded and he, too, apologized. The student who defaced DP's planner was orally reprimanded, while a student who taped the "Mr. Clean" poster to his locker was suspended from school for one day. With respect to the locker room assault after baseball practice, NH was reprimanded and his parents were notified (even though DP told the authorities that NH was only "playing around"), and LP was suspended for the rest of the school year, criminally prosecuted, and formally expelled. Significantly, as the district court observed, and as the majority appears to recognize, no identified perpetrator ever harassed or caused problems for DP after being disciplined by the school. There were no repeat offenders, so the only reasonable conclusion from the undisputed facts in the record is that the school's actions, with respect to those offenders, were 100% effective.[5]

In addition to investigating all the reported claims of harassment and punishing the offenders so that they never once re-offended, the defendant took additional steps to help DP. For example, his science teacher, Ted Adams, agreed to be extra vigilant in looking out for him. *See* J.A. at 825. DP's mother testified that this gave her "a new sense of relief" because "Mr. Adams was always in the hall watching for [DP], keeping an eye out for him." *Id.* Other teachers agreed to keep watch on him as well. *Id.* at 761, 813. Another of his teachers offered suggestions on how to help DP better cope with his peer-related problems, such as enrolling in extracurricular social programs like band, science olympiad, and other activities. *Id.* at 525, 817. School counselor Susan Mansfield invited DP to attend both group and individual counseling sessions for students having problems with their peer relationships. *Id.* at 470-71. The school district also took the unusual step of sending a school social worker and psychologist to his home to meet and evaluate him during his (and their) summer break. *Id.* at 374, 570. He was given extra time to take his exams, he was given seating preferences to avoid

---

[5] The incident that took place in the seventh grade when DP intervened in a dispute between two female students and, in the process, was slapped by one of the girls, *see* Maj. Op. at 3, does not give rise to an inference of deliberate indifference. He told the teacher what occurred, but he claims that nothing was done. Assuming that to be true, it is apparent that the slap was unrelated to the type of harassment at issue in this case. By his own testimony, DP was not the intended victim --- he got involved because he was defending the other girl --- nor does it appear that this incident was in any way related, or similar, to the harassment which is the subject of this litigation. Indeed, he never had any other problems with the girl. *See* J.A. at 677-79.

students with whom he might have problems, and he was referred to a social worker for counseling several times each month. *See id.* at 42. The school provided DP with an individualized evaluation program following his ninth grade year. He earned As and Bs, and, as part of his curriculum, he took college courses (at school district expense) which allowed him to take advanced classes, to become fluent in Japanese, and to graduate early from high school.

The school took additional steps that warrant closer review and discussion. First, Principal Greg Rozeveld offered to meet DP every day to provide assistance while he was in middle school, but the majority seems to fault the school district for the timing and circumstances under which these meetings occurred. *See* Maj. Op. at 3-4. When DP was in the seventh grade, the Pattersons spoke to Principal Rozeveld and told him that they were planning to withdraw DP from school. The parties had a very long meeting during which, according to Ms. Patterson, Mr. Rozeveld said that he "really hated to lose the good ones, the good kids," and he asked if there was "anything he could do to help." He offered to meet and counsel DP every day and "start interceding himself." DP's mother explained that Principal Rozeveld offered to meet with DP for two interrelated reasons: he wanted to help him academically, and he wanted to "build[] the trust" so that DP would not feel like he was "all alone." The Pattersons were "grateful for somebody offering to help," so they accepted Principal Rozeveld's offer and kept DP in school. DP's mother testified that the first time DP met Principal Rozeveld it was "very nice." However, the next two or three times that DP went to his office, Mr. Rozeveld was in a meeting or otherwise unavailable. DP's mother explained to DP that "sometimes that is going to happen, emergencies come up." It appears that because Principal Rozeveld (as head of the middle school) could not always be guaranteed to be in his office at the time DP's teachers sent him down during class, it was decided that DP would be sent down at the end of the day along with the students who were having their planners signed. DP did this and met with Principal Rozeveld for a number of weeks, but DP then decided he did not want to continue going because he was concerned the other students might start to think he was a "problem student." *See* J.A. at 844-850. That was his choice. It is undisputed that Principal Rozeveld offered to, and did, regularly meet with

and counsel DP until DP stopped the sessions. It is also undisputed that Principal Rozeveld did this to keep DP in school, to improve his grades, to build his trust, and to prevent him from feeling alienated. That DP might have preferred to meet with Mr. Rozeveld at a different time and under different circumstances does not take away from the fact that --- rather than being deliberately indifferent --- Mr. Rozeveld was unquestionably trying to help DP through this difficult time.

Second, the school district placed DP in a "resource room" for part of each day while he was in the eighth grade which, everyone agrees, worked very well for him. The majority states that the resource room reduced the actual amount of harassment directed at DP, *see* Maj. Op. at 15-17, n.7, and it faults the school district for discontinuing that room once DP entered high school. *See id.* at 5-6, 15-17. The undisputed facts do not support such an inference. It is true that the resource room was available to DP for one hour each day while he was in the eighth grade. He went there to meet his science teacher, Mr. Adams, and "just kind of wind my day down with him, do my homework." *See* J.A. 621-22. It was the equivalent of study hall. Because DP claims that the harassment occurred in his classes, in between his classes, in the hallways, at lunch, and in the locker areas, it simply does not follow that a study hall for an hour each day could have reduced the harassment to an appreciable degree. In fact, not even DP claims that it did. Rather, he testified that eighth grade was "going good" on its own, and he had "no clue" what caused this positive turnaround. *See id.*[6] What is established by the undisputed facts is that the time spent with Mr. Adams helped DP cope with his peers which, in turn, helped him better deal with the harassment and learn more effectively. Indeed, DP testified that even though he was sometimes picked on and called names in the eighth grade, the harassment did not "bother" him during the time that he was meeting regularly with Mr. Adams. *See* J.A. at 622. This distinction between meeting

---

[6]I emphasize that it was DP himself who testified that the resource room was the equivalent of a study hall ("I would just kind of wind my day down with [Mr. Adams], do my homework"), and, furthermore, not even he claims that it reduced the actual harassment ("Q: What happened to cause that turnaround? A: I have no clue."). J.A. at 621-22. DP explained that other students in the resource room needed help with their homework, but he "just needed Mr. Adams in there in case I needed him." DP thus benefitted from time in the resource room because Mr. Adams was his "go-to person" and "one of the only staff members at the school that I felt like I could trust." *See* DP's Depo. at 67-69.

with Mr. Adams and being in the resource room is important, for there is nothing in the record to indicate that the resource room itself reduced the actual amount of harassment, as the majority suggests. Rather, it appears that the resource room was effective because of Mr. Adams. DP could not continue getting daily assistance from Mr. Adams once he entered high school, however, because Mr. Adams worked exclusively for the middle school. Nevertheless, even though he did not work for the high school, the defendant granted Mr. Adams special authorization to meet with DP for 20-30 minutes each week (which he did), even after DP entered the ninth grade. *See* J.A. 854-57. If the defendant was deliberately indifferent to DP and his situation, surely it would not have authorized the middle school science teacher to meet and counsel him every week after he started high school. No reasonable finder of fact could find that there was deliberate indifference with respect to Mr. Adams and the resource room.

And lastly, the school district had various policies and programs dealing with harassment and bullying. All students were well aware that such conduct would not be tolerated. The student athletic code, for example, provided that students were expected to "behave appropriately in the locker room. Horseplay and vandalism will not be tolerated by the coaches or the athletic department." *See* J.A. 54. Violations of this policy were punishable as provided for under the code. The student handbook (which applied to all students, not just athletes) prohibited vandalism, physical confrontation, and inappropriate language, and it also provided for punishment to violators. *See id.* at 82-88. There were two school-wide programs implemented which dealt specifically with peer harassment and bullying, "Bang, Bang, You're Dead" and "Flirting and Hurting." The majority refuses to consider the policies and programs because it finds evidence that they were "not explained to every student and teacher." *See* Maj. Op. at 18 n.10. For this, the majority cites an affidavit from a former student and classmate of DP's who, although she recalls the teachers reviewing the student code of conduct with students, does not "recall ever receiving any *serious instruction* about bullying, teasing or harassment of other students." *See* J.A. at 145 (emphasis added). The majority next relies on an affidavit by a temporary substitute teacher (DP's brother) who taught at DP's middle school for less than four months and who affirms that he did not receive

instruction on the policy for bullying and harassment. *See* J.A. at 228. The majority also cites to an affidavit signed by the plaintiffs' expert witness who has opined that, in any event, "no matter how powerfully presented, [one-time programs such as "Bang, Bang, You're Dead"] have not been demonstrated to have a significant lasting impact on a school's climate or culture or reducing or eliminating bullying or harassment." *See* Maj. Op. at 18 n.10. Although this evidence (accepted as true for purposes of the summary judgment motion) may speak to the overall effectiveness of the policies and programs, and may be relevant if negligence were the standard, its relevance to the issue of deliberate indifference is questionable. *Cf. Sanchez v. Alvarado,* 101 F.3d 223, 229 (1st Cir. 1996) (defendant had an inefficient and ineffective anti-harassment policy and "leisurely" responded to harassment complaints; whether the policy could have been more effective and better-implemented may have some bearing on whether defendant was negligent, but noting *that is not the standard for deliberate indifference*). The affidavits relied on by the majority do not create a genuine issue of material fact on the issue of deliberate indifference. The majority has not cited any case law, and my own research has uncovered none, holding that good faith (although inefficient) policies and programs addressing peer harassment and bullying may be considered in the deliberate indifference context only if the students subjectively perceive them to be "serious instruction;" only if temporary substitute teachers are aware of them; and only if they have been first shown to have "significant lasting impact."

In light of the above, it seems to me that the district judge properly found that there were no genuine disputed issues of material fact and that, as a matter of law, the school was not deliberately indifferent. As already noted, deliberate indifference is a high standard to meet, and the analysis is very deferential to schools. Relying on *Davis, supra,* the Sixth Circuit has described the appropriate legal standard as follows:

> The recipient is liable for damages only where the recipient itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to known acts of harassment. *See Davis,* 526 U.S. at 642, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (discussing *Gebser v. Lago Vista School Dist.,* stating liability arose from recipient's official decision not to remedy the violation). "[T]he deliberate indifference must, at a minimum,

'cause [students] to undergo harassment or make them liable or vulnerable' to it." *Davis,* 526 U.S. at 645, 119 S. Ct. 1661, 143 L. Ed. 2d 839.

*Vance v. Spencer County Pub. School Dist.,* 231 F.3d 253, 260 (6th Cir. 2000). The Sixth Circuit's language is particularly on point in this case:

> The recipient is not required to "remedy" sexual harassment nor ensure that students conform their conduct to certain rules, but rather, "the recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable." *Davis,* 526 U.S. at 648-649. The deliberate indifference standard "does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action." *Id.* at 648. The standard does not mean that recipients must expel every student accused of misconduct. *See id.* Victims do not have a right to particular remedial demands. *See id.* Furthermore, courts should not second guess the disciplinary decisions that school administrators make. *See id.*

> "The Supreme Court has pointedly reminded us, however, that this is 'not a mere "reasonableness" standard' that transforms every school disciplinary decision into a jury question." *Gant,* 195 F.3d at 141 (quoting *Davis,* 526 U.S. at 649). In an appropriate case, there is no reason why courts on motion for a directed verdict could not identify a response as not "clearly unreasonable" as a matter of law. *See Gant,* 195 F.3d at 141.

*Id.* The majority glosses over this high legal standard rather quickly, *see* Maj. Op. at 12-13, and it seizes upon the following additional language in *Vance*:

> [W]here a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior. Where a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances.

231 F.3d at 261. The majority seems to interpret these two sentences to mean that even if the school district takes disciplinary action in response to all known harassment, and even if that action is 100% effective against the individual harassers, it may be liable if there is subsequent harassment by new offenders. There is no authoritative case law to support such an interpretation. For this sweeping expansion of *Vance*, the majority relies heavily on a single out-of-circuit *district* court case, *Theno v. Tonganoxie Unified School*

*Dist. No. 464,* 377 F. Supp. 2d 952 (D. Kan. 2005). The district judge in that case did, indeed, reach the same conclusion as the majority. However, there are two reasons why it cannot be relied upon.

First, it is merely one district judge's opinion and has no authoritative value. Indeed, this very same panel recently noted that *intra*-circuit district court cases are of limited value. *See United States Student Ass'n Foundation v. Land,* 546 F.3d 373, 383 n.8, 385 n.10 (6th Cir. 2008). It seems to me, then, that the opinion of a single district court judge from *outside* this circuit is an even thinner reed upon which to base an expansion of this court's jurisprudence.

Second, and more significantly, it is not persuasive regarding the applicable legal standard. I do not believe the district judge's opinion in *Theno* and the majority's opinion today are justified by the Sixth Circuit's analysis in *Vance*, nor are they otherwise consistent with any circuit's case law. The harassment in *Vance* was far more egregious, and the response thereto was far less appropriate, than in this case. The student in *Vance* was subjected to widespread harassment and physical abuse. She was the victim of frequent and vulgar name-calling ("whore" and "gay girl," etc.), and she was touched inappropriately in almost every class. She was stabbed in the hand with a pen during one assault, and, on another occasion, two students held her down and tried to rip off her clothes while another student took off his pants and said that he was going to rape her. School officials "talked to" the offenders, but, incredibly, did not take any further disciplinary action against them. The harassing conduct not only continued, but it increased. In fact, the offenders confronted her *after* they had been "talked to" specifically in order to harass her again. Even though "'talking to the offenders' produced no results, [the school] continued to employ this ineffective method." *See* 231 F.3d at 262. It was this factual background which led this court to conclude that if a school district "has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances." *Id.* at 261. *Vance* thus confronted the situation where the harassing students *re-offended after they were disciplined* (*i.e.*, the discipline

"produced no results"), yet the school knowingly continued to use the same ineffective method. This conclusion has no application whatsoever to the present case where the reprimands and other forms of discipline were extraordinarily effective as to the known offenders. The facts of this case are plainly distinguishable from *Vance*. Again, the defendant here investigated DP's complaints, and the offending students were counseled, reprimanded, suspended, and/or expelled, depending on the nature of their specific misconduct. No student who received discipline ever bothered DP again. The undisputed facts thus establish that the school district's actions were 100% effective with respect to those students.

On this point, a decision out of the Third Circuit is very similar and persuasive. *See Doe v. Bellefonte Area School Dist.*, 2003 WL 23718302 (M.D. Pa. Sept. 29, 2003), *aff'd* 106 Fed. Appx. 798 (3d Cir. Aug. 4, 2004).[7] The student there was ridiculed and harassed by his fellow students for years. He was called "queer," "gay boy," "pixie," "faggot," and "peter-eater," among other things. He was pushed at school and physically assaulted at the bus stop. He reported some (but not all) of the bullying and harassment, and the school took varying degrees of disciplinary action when the harassment was reported. Some of the offenders were given verbal warnings and reprimands, some were counseled about the seriousness of the harassment, some were given detention, and others were suspended. Notably, every time the school warned or disciplined an offender, "that perpetrator never bothered Doe again. The School District's method of dealing with specific, identified perpetrators involving Doe was one hundred percent effective." 2003 WL 23718302, at *9. Based on the 100% success rate with the individual offenders, coupled with the school agreeing to be extra "vigilant" of the problems and having an anti-harassment policy, the district court granted summary judgment in favor of the school district because "no reasonable finder of fact could conclude that the School District was deliberately indifferent to the harassment of Doe,

---

[7]Although this is an unpublished case and has no precedential value in this circuit, a decision of a three-judge panel from a sister court of appeals has to be more persuasive than a single district judge's opinion from outside this circuit.

or that its responses to the harassment of which it was aware were clearly unreasonable." *Id.* at *9-10

The plaintiff appealed, arguing, as the plaintiffs do here, that the school "should have treated the pattern of harassment as a systemic problem," and its failure to do so was deliberate indifference. 106 Fed. Appx. at 799. He argued that the school's response was clearly unreasonable in light of the known circumstance that the harassment continued, even though "each subsequent incident involved a student other than the student that had been disciplined in any of the prior incidents of harassment directed at Doe." *Id.* In affirming, the Third Circuit relied upon the Supreme Court's guidance to lower courts in *Davis,* and held:

> The relevant inquiry for purposes of evaluating whether the School District here was deliberately indifferent to known circumstances of harassment is to review its response to reported incidents of harassment. *Each and every time Doe complained, the School District responded with reasonable actions which eliminated further harassment between Doe and the student(s) involved in each incident.* Students were suspended and others were given warnings and counseled regarding the seriousness of harassment. In addition, the School District circulated memoranda to faculty and staff putting them on notice of the reported harassment of Doe and requesting assistance to prevent further incidents. Doe was provided with a special means of reporting any additional harassment through the school psychologist, whom he knew personally. The School District also held assemblies and enacted policies addressing peer-to-peer harassment. Such actions are not clearly unreasonable.
>
> Nor was the School District deliberately indifferent because it did not undertake the specific remedial action that Doe desired given what he perceived to be the "systemic nature of the harassment." *Davis* does not require school districts to purge their schools of actionable peer harassment or to engage in particular disciplinary action. *Id.* at 648. *We will refrain from second-guessing the disciplinary decisions made by the School District which effectively eliminated each reported source of harassment.* We do not minimize the unfortunate verbal abuse that Doe was subjected to during his high school years, but *the School District was not deliberately indifferent because additional harassment occurred under new and different circumstances.* We will affirm the judgment of the district court.

*Id.* at 800 (emphasis added).[8]

More importantly, it seems to me that the majority's decision today is inconsistent with a recent decision from this court. The plaintiff in *S.S. v. Eastern Kentucky Univ.,* 532 F.3d 445 (6th Cir. 2008), who had physical and mental disabilities, was harassed by fellow students. The harassment was systemic and it lasted for three years. Among many other things, the students called him "gay," "queer," "bastard," and "retard;" they pushed and tackled him in the hallway and lunchroom; they threw paper towels at him that had been soaked with water or urine; they threw bleach on him in science class; and they slammed his head into a glass sneeze-guard, the latter incident necessitating a trip to the hospital and treatment for a sprained neck. On one occasion, a student sexually assaulted the plaintiff by grabbing plaintiff's genitals and saying "Now I'll see if you are a woman." After a fight between the plaintiff and "one of his frequent attackers," the police were called to the school.[9] When these incidents were reported, "they were investigated, and responsive action was taken." *See S.S. v. Eastern Kentucky Univ.,* 431 F. Supp. 2d 718, 728 (E.D. Ky. 2006). The school responded to the incidents of which it was made aware by conducting interviews to decide who was at fault and disciplining those who were; instructing S.S.'s classmates not to taunt him; speaking to the students about the name-calling; adding extra monitoring; at times

---

[8]*Bellefonte*, as noted, is quite similar to this case. The Third Circuit found it significant that the offending students were given warnings and counseled about the seriousness of their actions; each time the school took action the harassment by that particular student stopped; the teachers were advised and agreed to be vigilant about future harassment; the plaintiff was given the means to report harassment through a faculty member whom he knew and trusted; and the school district had an anti-harassment policy. Each of these factors is present here. I also note that in deciding *Bellefonte*, the Third Circuit impliedly rejected the interpretation of *Vance* suggested by the majority today, even though it was urged by the appellant on appeal. *See generally* 2004 WL 3759879, at *20-21, *25-28 (appellant's brief) (interpreting and citing *Vance* for the view that if a school district discovers that its response to known harassment is inadequate against "systemic harassment" (even though it may be effective against the individual harassers), then the school must take "additional actions" to avoid "new liability").

[9]These facts are set forth in the district court opinion granting summary judgment for the defendant, 431 F. Supp. 2d 718 (E.D. Ky. 2006), which the Sixth Circuit stated was "an accurate description of the numerous incidents that underlie S.S.'s claims." *See S.S., supra,* 532 F.3d at 449. Although there was a dispute as to whether all of the events happened as the plaintiff described, or whether he was himself responsible for initiating many of the confrontations, the court assumed, as it was required to do on summary judgment, that the plaintiff's evidentiary assertions were true. *See, supra,* 431 F. Supp. 2d at 727-28.

separating S.S. from students with whom he had problems; assisting the police in regards to the fight noted above; and contacting the parents of students involved.

Despite these efforts, the harassment continued, and S.S. filed suit against the school under the Americans with Disabilities Act.[10] He argued, in relevant part, that the school did not adequately respond to, and end, the harassment. The district court granted summary judgment in favor of the school, and, on appeal, the Sixth Circuit confined its analysis to the deliberate indifference issue. To illustrate the distinction between when the issue should be left for the jury to decide, and when it can be decided on summary judgment, this court discussed two district court cases that it believed were "instructive," *K.M. v. Hyde Park Cent. School Dist.,* 381 F. Supp. 2d 343 (S.D.N.Y. 2005); *Biggs v. Board of Educ. of Cecil County, Maryland,* 229 F. Supp. 2d 437 (D. Md. 2002).[11] In *K.M.*, the student endured peer harassment for years. The school had notice of the harassment, but it took no steps to help or protect him and no one was disciplined. On those particular facts, the district court properly denied summary judgment for the school. *Biggs*, by contrast, involved similar peer-on-peer harassment, but in that case the school took action whenever there was a reported incident, including counseling the victim, meeting with the offenders and threatening them with suspension, notifying the parents, and alerting teachers to the problem. Because such responses established that the school district was not deliberately indifferent, the district court properly granted summary judgment for the school. The Sixth Circuit observed that the facts of *S.S.* "closely mirrored" *Biggs* and it went on to conclude that the school was not deliberately indifferent as a matter of law, even though its efforts were unsuccessful and even though the widespread harassment continued. This court explained that "meeting with the students, communicating with parents, and disciplining the offending students" simply did not "give rise to an inference that [the school] was deliberately indifferent to S.S.'s

---

[10]Although the action was not filed under Title IX, the Sixth Circuit evaluated the ADA claim pursuant to, and applied the deliberate indifference standard under, the framework set forth in *Davis*. *See* 532 F.3d at 453-54.

[11]I note that the Sixth Circuit looked to these out-of-circuit district court cases merely for illustrative purposes and not, as the majority apparently does with *Theno*, as a significant basis for its holding.

situation or that it had an attitude of permissiveness that amounted to discrimination." *See* 532 F.3d at 455-56. Insofar as the defendant here took essentially the same action (investigating, counseling, extra monitoring by staff, seating preferences to separate DP from problem students, meeting with and disciplining the students found at fault, contacting parents, and assisting the police --- the sum of which was 100% effective against the individual harassers), this case is a close fit to the scenario in *S.S.*

That is not to say, of course, that a school may avoid liability merely by taking some action, however minor, in response to known harassment. *See Vance, supra,* 231 F.3d at 260 (rejecting the argument that as long as a school district "does *something* in response to harassment," then it has not acted with deliberate indifference) (emphasis added). The pertinent inquiry is whether the response was appropriate under the particular circumstances. Quoting the Title IX guidelines, *Vance* described an "appropriate response" to known harassment as follows:

> [Schools] should take immediate and appropriate steps *to investigate or otherwise determine what occurred* and take steps reasonably calculated to *end* any harassment, *eliminate* a hostile environment if one has been created, and *prevent* harassment from occurring *again.*

*Id.* at 261 n.5 (emphasis added). Thus, a school acts appropriately if it investigates what has already occurred, reasonably tries to end any harassment still ongoing by the offenders, and seeks to prevent the offenders from engaging in such conduct again. That is exactly what happened in this case. It is manifestly unreasonable to read the guidelines and *Vance* as holding that a school district may be responsible for not preventing *future* harassment by *entirely separate and new* harassers. To suggest otherwise, as the majority does, comes extremely close to requiring that schools be "purged" of all offensive behavior and be completely harassment-free, which the Supreme Court and Sixth Circuit have unequivocally held is not required --- or possible. *See Vance, supra,* 231 F.3d at 260-61 (citing and quoting *Davis*).

Whether the defendant, from an objective viewpoint, could have (or should have) done more to stop the harassment is not the appropriate inquiry. "Lack of objective reasonableness, *i.e.*, a failure to act as a reasonable person would have acted, does not

by itself equal deliberate indifference." *See Brooks v. Celeste,* 39 F.3d 125, 129 (6th Cir. 1994). Nor does liability turn upon whether the school successfully remedied the harassment. The only question is whether the school "*intentionally acted in clear violation of Title IX* by remaining deliberately indifferent *to known acts of harassment,*" and whether its response was so "clearly unreasonable" and inadequate that it facilitated and subjected DP to harassment. *Vance, supra,* 231 F.3d at 260; *see also Davis, supra,* 526 U.S. at 642-47. Based on the undisputed facts in the record, any reasonable juror would have to answer that question "No." Therefore, as a matter of law, the district court properly held that the defendant was not deliberately indifferent.

For these reasons, I believe the district court's decision should be affirmed and I respectfully dissent.